Argued and submitted June 25, 1991, affirmed January 15, reconsideration denied March 4, petition for review denied April 28, 1992 (313 Or 209)

Clinton D. COOPER,
*Appellant,*

*v.*

PORTLAND GENERAL ELECTRIC
CORPORATION,
*Respondent,*

*and*

BUSINESS RISKS INTERNATIONAL,
dba Professional Law Enforcement
Group of Business Risks International,
*Defendant.*

(8912-07401; CA A66982)

824 P2d 1152

Gig Wyatt, Salem, argued the cause for appellant. With him on the briefs was J. P. Harris II, Salem.

Charles F. Hinkle, Portland, argued the cause for respondent. With him on the brief was Stoel Rives Boley Jones & Grey, Portland.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiff appeals from a judgment for defendant Portland General Electric (PGE) after its motion for summary judgment was granted in this action for defamation and intentional interference with plaintiff's economic relationship with his employer. The judgment disposed of all claims against PGE, but not the other defendants, and was entered pursuant to ORCP 67B.

We view the evidence in the light most favorable to plaintiff. Plaintiff was an employee of North American Energy Company (NESCO), a corporation owned by four utilities (PGE, Pacific Power & Light, Puget Power & Light and Washington Water Power) for the purpose of providing maintenance services to them and to others. PGE operates the Trojan nuclear power plant in Rainier, Oregon. Once each year, beginning in April, the Trojan plant shuts down for maintenance and refueling that cannot be done while the plant is operating. PGE contracts with NESCO to provide personnel for maintenance. For three or four years before 1989, plaintiff, a pipe fitter, was among the personnel supplied to PGE by NESCO.

In order to work at Trojan, every NESCO employee must pass security clearance administered by PGE, which includes a thorough background investigation to determine whether there is any information indicating that the employee would pose a security threat to the plant. If the investigation reveals no adverse information, the employee may be granted "unescorted access authorization." Each year up to 1989, plaintiff had been granted that authorization.

On February 9, 1989, Culp, who was in charge of PGE's security program at Trojan, received a telephone call from Marosi, regional manager of the Professional Law Enforcement Group of Business Risks International, a firm engaged in investigative and consulting work for government agencies and private corporations. Culp knew Marosi, having met him on several occasions at meetings of local security associations. Marosi told Culp that he was involved in an undercover investigation of criminal activity in Columbia

County, Oregon, for another business. He said that an under-cover agent had identified plaintiff as a user and dealer of cocaine and that the agent was a "professional undercover source under his management" who was "trained, experienced, and used in different cases" and "had been successful in testifying in court before." Marosi did not identify the agent, explaining that he did not wish to jeopardize the ongoing investigation. In a later conversation, Marosi told Culp that plaintiff had given an informant a substance that later was determined to be cocaine.

Culp sent a memorandum to the security file at Trojan regarding plaintiff:

"The above named individual has previously been granted unescorted access to Trojan as an employee of NESCO.

"While not currently at Trojan, it is possible the subject could return to Trojan for access without notification to this department.

"Until further notice, this person should not be given access to Trojan without my expressed authority."

At the end of March, 1989, the annual maintenance shutdown of Trojan was about to begin. Plaintiff came to the plant on March 30 to prepare for work. On that day, Culp informed Ankrum, who was his supervisor, of the information that he had learned from Marosi regarding plaintiff. He also notified Lodge, NESCO's project manager at Trojan, that PGE "could not approve [plaintiff] for unescorted access at this time." That day, NESCO laid plaintiff off from work at Trojan.

Culp then asked plaintiff to complete a new personnel security questionnaire, so that an additional background investigation could be conducted. Plaintiff's labor union pressured Lodge to get plaintiff back to work. In April, Lodge had a number of telephone conversations with Culp, and on April 24, 1989, plaintiff went to Culp's office with his union's business manager. The manager asked Culp to explain why plaintiff's security clearance had been suspended, and Culp told him that it was because "we had received information indicating that there was a serious question about his eligibility for a clearance."

On April 25, plaintiff and two union officials met with Lodge. During that meeting, Lodge telephoned Culp and asked him whether plaintiff was then eligible for security clearance. Culp answered that he was not. A few minutes later, Lodge telephoned Culp again to tell him that plaintiff intended to file a grievance against NESCO and asked Culp to send a memorandum describing the events leading up to the denial of plaintiff's security clearance. Culp agreed and, on the following day, he sent a letter to Lodge describing the events of the preceding week. Culp stated in the letter that PGE had "received information about [plaintiff] from a reliable source who requested anonymity. The information indicated that [plaintiff's] presence within the Trojan Nuclear Plant would constitute a security threat to the plant." The April 25 statement and the April 26 letter form the basis for plaintiff's defamation claim against PGE.[1]

Culp testified on deposition that further investigation yielded no additional information suggesting that plaintiff should be denied access to the plant. Culp then met with Marosi on July 5, 1989, and received a written report that repeated Marosi's earlier statements about plaintiff. Marosi also gave Culp a statement signed by Thompson, Marosi's undercover agent, detailing the events involving plaintiff's purported use and distribution of cocaine.

In this action, plaintiff alleges, among other claims, that PGE acted negligently in making a false and defamatory statement to NESCO regarding him and that, by making that statement, PGE interfered with his business relationship with NESCO. The trial court granted defendant's motion for summary judgment on the grounds that PGE had had a qualified privilege to make the statement and that plaintiff had not met his burden to show that PGE had abused the privilege by acting with "actual malice." Plaintiff concedes that defendant acted under a qualified privilege. He also agrees that, because his claim for intentional interference with a business relationship is based on the same statement on which his defamation claim is based, it is subject to the same qualified privilege defense. *Walsh v. Consolidated Freightways*, 278 Or 347, 358, 563 P2d 1205 (1977). The only

---

[1] PGE admits, for the purpose of summary judgment only, that the statement was false.

issues concern whether there is a material issue of fact whether PGE abused the occasion giving rise to its privilege when it made the statements to NESCO.

■ ■ At common law, a person who made a false and defamatory statement was liable without fault. *Bank of Oregon v. Independent News*, 298 Or 434, 438 n 2, 693 P2d 35 (1985); *Wheeler v. Green*, 286 Or 99, 593 P2d 777 (1979). There has developed a "constitutional" privilege for a defamation defendant. If the plaintiff is a public figure or a public official and the matter involves a question of public interest, the First Amendment's protection of expression permit liability to attach only on a showing of "actual malice," by which is meant that it must be shown that the defendant knew of the falsity of the statement or acted in reckless disregard of whether it was true or false. *New York Times Company v. Sullivan*, 376 US 254, 279-80, 285-86, 84 S Ct 710, 11 L Ed 2d 686 (1964); *Curtis Publishing Co. v. Butts*, 388 US 130, 87 S Ct 1975, 18 L Ed 2d 1094 (1967); *Wheeler v. Green, supra*, 286 Or at 108; *see Harley-Davidson v. Markley*, 279 Or 361, 366, 568 P2d 1359 (1977).

In *Rosenbloom v. Metromedia, Inc.*, 403 US 29, 44, 29 L Ed 2d 296, 91 S Ct 1811 (1971), the plurality opinion suggested that the same constitutional concerns that restrict the liability of a person who makes a defamatory statement about a public official or public figure are applicable to cases involving private individuals, if the defamatory statement involved a matter of public or general interest. However, the Court backed away from that position in *Gertz v. Robert Welch, Inc.*, 418 US 323, 94 S Ct 2997, 41 L Ed 2d 789 (1974), which weighed the interests of the press in the free expression of matters of public concern against the state's interest in compensating injury to the reputations of private individuals. It held that the heavy burden placed on a public official or public figure to establish defamation should not apply to private plaintiffs who have not voluntarily placed themselves in the public scrutiny, who are more vulnerable to injury and who do not have access to effective channels of communication that public figures enjoy.

The Court said that the state's interest in compensating private individuals for injury to reputation sufficiently outweighs the press's interest in applying the more stringent

standard for imposing liability adopted in *New York Times*. It declined to hold that a private individual must show actual malice in order to establish the liability of a media defendant for defamation concerning matters of public interest. It held that states "should retain substantial latitude" in providing a legal remedy for defamation of a private individual, 418 US at 345, and that, so long as they do not impose liability without fault, they may chose the appropriate standard for imposing liability on a media defendant who defames a private individual regarding a matter of public concern.[2]

PGE suggests, however, that *Gertz* applies whenever the defamatory statement involves a matter of public concern or public interest, even if no media defendant is involved, and that, at a minimum, negligence is required to hold any defendant liable for defamatory statements involving such matters. Because *Gertz*, and the cases from which it evolved, involve media defendants and because the imposition of liability "for purely private defamation does not abridge the freedom of public speech or any other freedom protected by the First Amendment," *Harley-Davidson v. Markley, supra*, 279 Or at 370, the Oregon Supreme Court has interpreted *Gertz* to apply only in the context of media defendants. 279 Or at 368. At common law, and under the Oregon Constitution, the fact that the defamatory material involved a matter of public concern would not be sufficient, in and of itself, to give rise to a special privilege. *Bank of Oregon v. Independent News, supra*, 298 Or at 440.

Although *Dun & Bradstreet v. Greenmoss Builders*, 472 US 749, 105 S Ct 2939, 86 L Ed 2d 593 (1985), decided after *Harley-Davidson v. Markley, supra*, appears to have resurrected the plurality opinion in *Rosenbloom v. Metromedia, Inc., supra*, by suggesting that the basis for *Gertz* was not the defendant's status as a member of the media and that the focus of the analysis should be on whether the published

---

[2] The Court held, however, that the state's interest in compensating private individuals for injury to reputation by the media was limited to compensation for actual injury and that a private plaintiff may not recover punitive damages from a media defendant, unless the plaintiff shows that the defendant acted with knowledge of the falsity of the statement or in reckless disregard of its truth or falsity. Under the Oregon Constitution, however, punitive damages are not available in any defamation case. *Wheeler v. Green, supra*.

material involved a matter of public concern, we do not believe that that decision aids PGE. In *Dun & Bradstreet*, the Court held that publication of a false credit report to five of the defendant's subscribers was not a matter of public concern and was "not entitled to special protection to ensure that 'debate on public issues [will] be uninhibited, robust and wide-open.' " 472 US at 762.

The statements at issue in this case do not involve a question of public concern in the sense that the term has been used by the United States Supreme Court and the Oregon Supreme Court. Although the security of the Trojan nuclear facility is certainly a matter that concerns the public *welfare and safety*, the statements that PGE made concerning plaintiff do not involve a question of free expression or public debate that is entitled to special protection within the meaning of *New York Times Company v. Sullivan, supra; Gertz v. Robert Welch, Inc., supra;* and *Dun & Bradstreet v. Greenmoss Builders, Inc., supra*. Defendant's statements involved a question of personnel management, not a publicly debatable question concerning security policies at Trojan. The statements were not published in a way that made them available to the general public and they were not a subject for public discussion or comment. They involved a purely private matter between private parties, and the possibility of liability for defamation poses

> " 'no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press. The facts of the present case are wholly without the First Amendment concerns with which the Supreme Court of the United States has been struggling.' " *Dun & Bradstreet v. Greenmoss Builders, supra*, 472 US at 760 (quoting *Harley-Davidson, Inc. v. Markley, supra*, 279 Or at 366).

Because this case involves no public official or public figure, no media defendant and no statement on matters of public interest or concern in the sense necessary to invoke a constitutional privilege, we consider whether there is any other basis that would require plaintiff to prove "actual

malice"[3] in order to recover and, if not, whether, even if it was negligent, it abused its qualified privilege to make the alleged defamatory statements, either to protect its interests as an employer or because the statements dealt with a subject of mutual concern to PGE and NESCO. *Wattenberg v. United Medical Lab*, 269 Or 377, 380, 525 P2d 113 (1974).

*Restatement of Torts* § 599 says:

"One who publishes false and defamatory matter of another upon a conditionally privileged occasion is liable to the other if he abuses the occasion."

Section 601 says:

"Except as stated in § 602, one who upon a conditionally privileged occasion publishes false and defamatory matter of another abuses the occasion if, although believing the defamatory matter to be true, he has no reasonable grounds for so believing."

*Comment a* to section 599 says:

"The occasions described in §§ 594 - 598 are conditionally privileged, that is, the protection which they give is conditioned upon the manner in which the privilege is exercised. The unreasonable exercise of the privilege is an abuse of the occasion which defeats the protection otherwise afforded. The occasion may be abused because of the publisher's lack of belief or reasonable grounds for belief in the truth of the defamatory matter (see §§ 600 - 602); because the defamatory matter is published for some purpose other than that for which the particular privilege is given (see § 603); because

---

[3] PGE argues that *Restatement (Second) of Torts* § 600 (1977), which provides that a qualified privilege is abused if the defendant knows the matter to be false or acts in reckless disregard as to its truth or falsity, should be adopted in Oregon as a natural sequel to *Gertz*. However, in *Harley-Davidson v. Markley, supra*, 279 Or at 368, the Supreme Court expressly rejected the suggestion that *Gertz* requires a wholesale revision of the law of defamation:

"We are not impressed with the argument, advanced by both the Restatement (Second) and the Court of Appeals of Maryland, that because the news media is given a constitutional privilege, non-media defendants should be placed in no less a position. Because a private individual's right to recover for libel has been made more difficult in situations in which his interests have been at least partially outweighed by important constitutional values, it does not follow, for obvious reasons, that his recovery should be made more difficult in situations in which no such constitutional values are involved merely for the sake of securing symmetry of treatment of defendants." 279 Or at 370.

We do not believe that *Dun & Bradstreet v. Greenmoss Builders, supra*, affects that analysis.

the publication is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege (see § 604); or because the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged (see § 605)."

The discussion in that comment concerning the ways in which a qualified privilege may be lost was approved by the Supreme Court in *Schafroth v. Baker, supra,* 276 Or at 45, in place of the previously accepted, but much debated, requirement of "malice":

"The approach taken by the Restatement of Torts provides a much more helpful framework for jury instructions. Using this framework, the jury could be told that certain occasions are privileged, with appropriate specific instructions to assist in determining whether such an occasion was involved in the case. It could then be given appropriate instructions on what constitutes abuse of the privilege and the consequent loss of its protection. The term 'malice' as usually defined does not adequately call the jury's attention to the need for some relationship between the defendant's purpose and the purpose of the privilege, the defendant's belief as to the probable truth of the statement, the appropriateness of the scope of the publication, and other matters which are important in determining whether the defendant abused a privileged occasion." 276 Or at 46.

Thus, in Oregon, as under the *Restatement,* a qualified privilege, as a general proposition, may be abused in four ways. One of those might be applicable here: the publisher's lack of belief or reasonable grounds for belief in the truth of the defamatory statement. *See Benassi v. Georgia Pacific,* 62 Or App 698, 703, 662 P2d 760, *mod* 63 Or App 672, 667 P2d 532 (1983); *see also Walsh v. Consolidated Freightways, supra,* 278 Or at 355; *Koch v. Laborico,* 66 Or App 78, 674 P2d 602 (1983), *rev den* 296 Or 712 (1984).

Although we agree with PGE that there is no evidence in this record that would support a finding that it lacked reasonable grounds for belief in the truth of the statements, even if it did lack reasonable grounds for so believing, there is another basis for holding that PGE did not

abuse its privilege. *Restatement (Second) Torts* § 602 (1977)[4] says:

"One who upon an occasion giving rise to a conditional privilege publishes a defamatory rumor or suspicion concerning another does not abuse the privilege, even if he knows or believes the rumor or suspicion to be false, if

"(a)  he states the defamatory matter as rumor or suspicion and not as fact, and

"(b)  the relation of the parties, the importance of the interests affected and the harm likely to be done make the publication reasonable."

Here, the alleged defamatory statements were not that PGE knew as a fact that plaintiff was a security risk; rather, the essence of the statements was that PGE had received information that indicated that plaintiff's presence in the Trojan nuclear plant would constitute a security risk. Culp did not tell Lodge about plaintiff's alleged drug use or state as fact the alleged defamatory matter. In response to Lodge's request, he said merely that plaintiff's security clearance had been withdrawn because PGE had received information from a reliable, anonymous source, indicating that plaintiff's presence in the plant would constitute a security threat. Under § 602, Culp was entitled to do that, even if he was unsure of the truth of the information that gave rise to his concern about plaintiff's security clearance. That is so because of the relationship between PGE and NESCO and because of the importance of the interests at stake. NESCO supplied hundreds of workers to perform maintenance work at Trojan. There is no dispute but that the safety and security of the nuclear plant are of great importance, not only to the parties, but also to the public, and we take judicial notice of that. *See Florida Power & Light Co. v. Fleitas,* 488 So 2d 148 (Fla App 1986). We conclude that the analysis reflected in § 602, *supra*, is persuasive, and we adopt that analysis in this case. Because there is no evidence that PGE knew or believed the statements to be false, we need not decide whether that section should be the law in Oregon. The trial court did not err in granting defendant's motion for summary judgment.

Affirmed.

---

[4] *Restatement of Torts* § 602 is substantially the same.