Argued and submitted June 3, affirmed August 5, petition for review denied December 15, 1998 (328 Or 194)

Robert VANDERSELT,
*Appellant,*

*v.*

Peter T. POPE
and Pope & Talbot, Inc.,
a Delaware corporation,
*Respondents.*

(9605-03607; CA A97401)

963 P2d 130

Scott N. Hunt argued the cause for appellant. With him on the briefs were Richard C. Busse and Busse & Hunt.

Jonathan T. Harnish argued the cause for respondents. With him on the brief were Barbara A. Flug and Bullard, Korshoj, Smith & Jernstedt, P.C.

Before Riggs, Presiding Judge, and Landau and Wollheim, Judges.

RIGGS, P. J.

**RIGGS, P. J.**

Plaintiff brought this action against his former employer Pope & Talbot, Inc. (P&T), as well as its president, Peter Pope (Pope), asserting numerous tort and contract claims. The trial court granted defendants' motion for summary judgment on all but one of plaintiff's claims.[1] On appeal, plaintiff assigns error to the trial court's decision to grant defendants' motion for summary judgment on his other claims. For the following reasons, we affirm.

On a motion for summary judgment, we view the facts in the light most favorable to the nonmoving party. *Jones v. General Motors Corp.*, 325 Or 404, 939 P2d 608 (1997). Plaintiff's complaint alleged that defendants, by offering him only six months' severance pay on his termination, breached their contract for severance pay, breached their fiduciary duty to him, and tortiously breached an implied covenant of good faith and fair dealing. Plaintiff also alleged that defendants breached a contract for a loan, and that defendants defamed him.

The following facts are relevant to plaintiff's claims concerning severance pay. In 1991, plaintiff was approached by a headhunter, Fred Green, about coming to work for P&T to run its Consumer Products Division. Plaintiff told Green that he wanted a contract that provided for two years' severance pay. Green contacted Pope, then recontacted plaintiff and told him that P&T would not agree to the two-year severance pay proposal. Plaintiff then called Pope directly to discuss this issue. According to plaintiff's deposition, Pope told him "we don't do—we don't write, we don't give contracts that guarantee severance, that you are just going to have to trust me to be fair on that." Plaintiff accepted the job. The subject of severance pay was not brought up again.

The performance of the Consumer Products Division was poor between 1991 and 1995, and P&T contemplated the sale of that division. In May 1995, plaintiff met with some

---

[1] Plaintiff's remaining claim, for breach of a contract for stock options, went to trial and resulted in a verdict in defendant's favor, and that claim is not before us.

investment bankers and discussed the possibility of a management buyout of the division. Plaintiff and the investment bankers drafted a proposal by which plaintiff and other investors would acquire the division, and plaintiff presented the proposal to Pope. At that time, however, P&T was negotiating the sale of the division to another party, and Pope instructed plaintiff not to pursue his management buyout proposal. Pope also was concerned that plaintiff had revealed confidential financial information to the investment bankers in the course of preparing the proposal. Pope discussed his concerns with P&T's investment banker, who gave the opinion that plaintiff should be fired. Pope decided, however, that terminating plaintiff at that point could jeopardize the negotiations for sale of the division.

In October 1995, plaintiff's employment was terminated. Plaintiff was told that the reason for the termination was the poor performance of the Consumer Products Division. Plaintiff was offered a severance package of three months' salary. Plaintiff suggested that he should receive a severance package of one year's salary as well as extension of his stock options. He was then offered a severance package of six months' salary, which he rejected.

The facts pertaining to plaintiff's claim for breach of a contract for a loan are as follows. Plaintiff was living in Philadelphia at the time he accepted the job with P&T. P&T offered plaintiff relocation assistance pursuant to a written policy. That policy provided that P&T would buy plaintiff's Philadelphia house, with the price being based on the average of several independent appraisals. The appraisals, conducted in 1991, valued the house between $480,000 and $500,000. Plaintiff decided to try to sell the house himself, listing it with a realtor for $750,000 or $795,000. No offers were forthcoming in 1991 or 1992. In 1992, the tax-assessed market value of the house was dropped to $400,000. One of plaintiff's acquaintances in Philadelphia, Mr. Kontra, produced a potential buyer named Mr. Bradstreet. Ultimately, in March 1993, P&T purchased plaintiff's Philadelphia house for $600,000 and sold it to Mr. Bradstreet on contract. Kontra then demanded a commission, and P&T gave plaintiff $6,000 to pay Kontra's commission. Bradstreet later defaulted on

the contract, and P&T subsequently sold the house for $350,000.

Before the deal on the Philadelphia house was closed, P&T advanced plaintiff $25,000 to make a down payment on the house plaintiff was purchasing in Portland. P&T also advanced plaintiff another $15,000 for house-related purposes. When the sale of the Philadelphia house closed, plaintiff received an additional amount of about $150,000. After plaintiff purchased the Portland house, he approached Pope for a $50,000 loan to renovate the house. Pope refused to loan plaintiff the money, saying "We're not in the renovation business." Plaintiff then sold some stock to cover the costs of remodeling, and the price of the stock later rose.

The facts surrounding plaintiff's defamation claim are as follows. In early 1995, plaintiff terminated his vice president of operations, Bellafronto, in the course of downsizing the division. Shortly thereafter, Pope received a letter from Bellafronto claiming that P&T had terminated the wrong person and that plaintiff was running the Consumer Products Division into the ground so he could buy it at a low price. Pope showed the letter to several of the top management of P&T, and they decided that no response was appropriate as they did not believe the accusation against plaintiff.

Defendants moved for summary judgment on each of the claims described above, and the trial court granted defendants' motion. On appeal, plaintiff asserts that the trial court erred because genuine issues of material fact exist as to each of his claims. We turn first to the claims concerning plaintiff's severance pay.

Plaintiff asserts that the trial court erred in granting defendants' motion for summary judgment on his claim that defendants breached plaintiff's employment contract by failing to provide him with two years' severance pay on termination. The trial court granted defendants' motion on the ground that no contract for severance pay existed because no price was established. Plaintiff argues that a jury could have found that Pope's statement about being "fair" created an implied contract for severance pay for a "fair" amount, and that the question of what amount is "fair" is a question of fact.

■ Plaintiff is correct that, under certain circumstances, "fairness" or "good faith" may be a guide in establishing the price term of a contract. *See, e.g., Wyss v. Inskeep,* 73 Or App 661, 699 P2d 1161, *rev den* 300 Or 64 (1985) (terms of a bonus plan promised to employees were definite enough to establish enforceable contract, where the amount of money in the bonus pool was ascertainable and the written bonus plan stated that allocation of the pool would be determined "in good faith" by the board of directors). Here, however, we agree with the trial court that Pope's statement about trusting him to be fair about severance pay cannot, as a matter of law, be sufficient to form an implied contract to guarantee a "fair" amount of severance pay, given the circumstances. Pope's statement concerning fairness must be viewed in the context of the parties' negotiations for an *express* contract: Pope offered plaintiff employment; plaintiff made a counteroffer proposing that severance pay be included in their express contract; Pope rejected that counteroffer, stating that *"we don't give contracts that guarantee severance,* that you are just going to have to trust me to be fair on that." (Emphasis supplied.) Thus, Pope explicitly stated that he did *not* wish to enter into a contract with plaintiff concerning severance pay. We are aware of no cases where a party has been held to have formed an implied contract in spite of the party's clear, explicit, contemporaneous declaration that it did *not* wish to form a contract on that subject. Formation of a contract requires the meeting of minds, which is measured by objective manifestations of intent by both parties to form the contract. *Kaiser Foundation Health Plan v. Doe,* 136 Or App 566, 572, 903 P2d 375 (1995), *mod on recons* 138 Or App 428, 908 P2d 850, *rev den* 324 Or 294 (1996). Pope explicitly declared an intent not to enter into a contract for severance pay with plaintiff. The trial court correctly concluded that, as a matter of law, no contract for severance pay existed under those circumstances.

■ We next turn to plaintiff's tort claims concerning severance pay. Plaintiff asserts that, by offering only six months' severance pay, defendants breached a fiduciary duty they owed to him and also breached an implied covenant of good faith and fair dealing. In the present case, it is not necessary

for us to discuss the nuances of difference between these two types of tort action because,

> "[u]nder either theory breach of fiduciary duty or the tortious breach of duty of good faith and fair dealing, plaintiff was required to present evidence that a special relationship or fiduciary-type relationship existed between the parties that was independent of the duties under the [contract]." *Bennett v. Farmers Ins. Co.*, 150 Or App 63, 79, 945 P2d 595 (1997) (citations omitted).

Plaintiff asserts that Pope's request that plaintiff trust him to be fair gave rise to extra-contractual duties and created a special relationship between them.[2] In support of his argument, plaintiff cites *Eulrich v. Snap-On Tools Corp.*, 121 Or App 25, 853 P2d 1350, *rev den* 317 Or 583 (1993), *vacated on other grounds* 512 US 1231, 114 S Ct 2731, 129 L Ed 2d 824 (1994).

In *Eulrich*, the defendant fraudulently induced the plaintiff to enter into a dealership agreement to market its tools, misrepresenting the earning potential of the dealership and encouraging the plaintiff to overextend credit to customers. 121 Or App at 28-29. Within about a year, the plaintiff was in financial trouble and sought to exercise his rights under the agreement to terminate the dealership. *Id.* at 29. The plaintiff signed a termination agreement waiving any claims against the defendants without reading the agreement. He later sued to rescind the termination agreement and also claimed that the defendants had tortiously breached their duties of good faith and fair dealing. We held that the termination agreement was properly rescinded due to duress and that the plaintiff had a claim in tort for breach of a covenant of good faith and fair dealing that existed separate from the defendants' contractual duties. *Id.* at 34-36. We noted that, although generally a manufacturer-dealer relationship would not give rise to such duties, the defendants in that case had fostered a "fiduciary-type dependency relationship" with the plaintiff that was not typical of a dealership relationship, because the defendants' representatives rode along with the

---

[2] The parties acknowledge that employment, in and of itself, does not create a "special relationship." *See Conway v. Pacific University*, 324 Or 231, 244, 924 P2d 818 (1996).

plaintiff, performed sales for him, completed his paperwork, told him what office equipment and supplies to purchase, and exercised almost complete control over his stock, as well as encouraging him to overextend himself financially. *Id* at 36-37.

By comparison, in *Bennett v. Farmers Ins. Co.*, 150 Or App 63, 945 P2d 595 (1997), we found no special relationship to exist between the plaintiff, an insurance agent, and several insurance companies with whom he contracted. 150 Or App at 81-82. Under his agreement with the defendants, the plaintiff acted as a district manager over a geographical area. The plaintiff successfully managed his district for about 10 years, earning the defendants over $27 million in profits. The defendants then terminated the agreement, and the plaintiff sued them for breach of contract, breach of fiduciary duty, and tortious breach of the duty of good faith and fair dealing. *Id.* On the tort claims, we agreed with the trial court that, as a matter of law, there was no evidence of a special relationship between the parties giving rise to extra-contractual duties. *Id.* at 79. Applying the rules of law from *Eulrich* and from *Conway v. Pacific University*, 324 Or 231, 924 P2d 818 (1996), we concluded that the defendants did not have a fiduciary relationship with the plaintiff, because there was no undertaking by the defendants to act in the plaintiff's interest. *Id.* at 82.

The *Conway* case is perhaps the closest to the case at hand. In *Conway*, when the plaintiff was negotiating the renewal of his employment contract with the defendant university, an agent of the defendant assured him that poor student evaluations of his teaching "would not be a problem" that would affect his chances of obtaining tenure. 324 Or at 233-34. Several years later, the plaintiff was shifted off the "tenure-track" due to his poor student evaluations. *Id.* The plaintiff sued for negligent misrepresentation, which is actionable under Oregon law only if the defendant owes some duty to the plaintiff beyond the common-law duty of reasonable care. *Id.* at 236. Thus, the threshold question in *Conway* was whether a "special relationship" existed between the plaintiff and his employer that gave rise to a duty beyond the common-law duty of reasonable care. Such a heightened duty arises "when one party is acting, at least in part, to further

the economic interests of the other party." *Id.* at 236, citing *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992). The court went on:

> "Another way to characterize the types of relationships in which a heightened duty of care exists is that the party who owes the duty has a *special responsibility* toward the other party. This is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution." *Conway*, 324 Or at 240.

The court then proceeded to examine the nature of the relationship between the plaintiff professor and the defendant university to determine if a special relationship existed giving rise to a heightened duty. Comparing the relationship between the plaintiff and the university to the relationship between the parties in *Onita*,[3] the court noted that, unlike the *Onita* parties, the parties in *Conway* already had a contractual relationship when the misrepresentations were made, and thus "were not strangers coming to the bargaining table to negotiate a first time contract," and "were not in a fully arm's-length relationship" as were the parties in *Onita*. *Id.* at 241. Despite that factor, the court concluded that the relationship between the professor and the university "still falls short" of a special relationship, because at the time the misrepresentations were made, "both parties were acting in their *own* behalf, each for their own benefit, for the purpose of negotiating a renewal of Conway's contract." *Id.* at 242. The court concluded that no special relationship existed under those circumstances.

The present case is much more analogous to *Conway* and *Bennett* than it is to *Eulrich*. Here, plaintiff and Pope

---

[3] *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 843 P2d 890 (1992), concerned the relationship between parties to a real estate deal.

were negotiating at arm's length—they were "strangers coming to the bargaining table to negotiate a first time contract," *id.* at 241, and were experienced businessmen each acting on their own behalf and for his own benefit to negotiate an employment contract. A statement by one party that another would just have to trust him to be fair, uttered at the same time that the party is refusing to make any contractual guarantees on the subject under discussion, does not give rise to a duty to provide the very thing the party refused to contract to provide. It would be anomalous, to say the least, for us to conclude that an employer that has specifically stated that it will not guarantee severance benefits as part of an employment contract nonetheless has entered into a special relationship and undertaken a duty to act on behalf of the employee and against its own best interests in providing severance benefits. The trial court properly granted defendants' motion for summary judgment on plaintiff's claims for breach of fiduciary duty and tortious breach of the duty of good faith and fair dealing.

Plaintiff next contends that the trial court erred in granting defendants' motion for summary judgment on his claim that defendants breached an oral contract to loan him $50,000. Plaintiff's complaint alleged that defendants promised him at the time he was hired "a $50,000 loan to facilitate his purchase of a home in Portland, Oregon." In his deposition, plaintiff indicated that no promise for such a loan was made before his employment, but that, while his Philadelphia house was on the market, he discussed with Pope and various people who worked for P&T whether he could "get a loan to help with the down payment to get into a house in Portland." Plaintiff further indicated that no repayment terms were discussed. Plaintiff also indicated during his deposition that P&T gave him a $25,000 advance on his equity in the Philadelphia house, which he used as part of the down payment on his Portland house, as well as another $15,000 advance that plaintiff also used on the house. Both plaintiff and Pope indicated in depositions that, when plaintiff approached Pope for a loan to remodel his Portland house, Pope refused.

Plaintiff contends on appeal that a genuine issue of material fact exists as to whether defendants breached an

oral contract to loan him $50,000. The trial court granted summary judgment on the ground that there was no evidence in the record to support plaintiff's contention that there was a contract to loan him $50,000 for renovation of his house. We agree. Plaintiff alleged in his pleadings that a loan was promised to "facilitate his *purchase*" of a house in Portland, and his deposition testimony further indicates that the promised loan was to be for purposes of a "down payment" on a house in Portland. The evidence is undisputed that P&T did advance plaintiff money for purposes of closing on his Portland house. The record is entirely devoid of any evidence that defendants promised to loan plaintiff any money to remodel his house after he had purchased it. The trial court properly granted defendants' motion for summary judgment on this claim.

Finally, plaintiff alleges that the trial court erred in granting defendants' motion for summary judgment on his defamation claim. Plaintiff contends that Pope's repetition to several P&T management personnel of the allegation in Bellafronto's letter that plaintiff ran the Consumer Products division for his own personal gain was defamatory *per se* and that the trial court erred in granting defendant's motion for summary judgment. The trial court concluded that the statements in question fell within a qualified privilege.[4] That qualified privilege that may operate in the employment context has been described as follows:

> "A statement is conditionally privileged if: (1) it was made to protect the interests of defendants; (2) it was made to protect the interests of plaintiff's employer; or (3) it was on a subject of mutual concern to defendants and the person to whom the statement was made." *Wattenburg v. United Medical Lab.*, 269 Or 377, 380, 525 P2d 113 (1974), *citing Restatement of Torts*, §§ 594-96.

Whether a statement falls within the qualified privilege or not may present an issue of fact. *Wallulis v. Dymowski*, 323 Or 337, 350-51, 918 P2d 755 (1996). In the present case, however, we agree with the trial court that no genuine issue of material fact was presented for the following reasons.

---

[4] No issues are presented on appeal as to whether the statement was published, whether it was false, etc. Thus, we limit our analysis to the question of qualified privilege.

In order to overcome the qualified privilege, the plaintiff must produce evidence "of some kind of improper motive on defendant's part." *Wattenburg*, 269 Or at 380. In their motion for summary judgment, defendants pointed out that Pope discussed the accusation against plaintiff set forth in Bellafronto's letter only with several top management employees in the course of determining whether or how P&T should respond to the letter. Plaintiff responded that, because Pope did not have reasonable grounds for believing Bellafronto's accusation when he discussed the contents of the letter with other high-level management, a factual issue is presented as to whether the privilege was abused.

■ The fact that Pope had no basis for forming an opinion as to whether Bellafronto's accusation was true at the time he discussed it with his top management is not a fact from which malice or improper motive may reasonably be inferred under the circumstances. Plaintiff produced no evidence in opposition to defendants' motion for summary judgment that Pope acted with malice or an improper motive in discussing Bellafronto's accusation with certain P&T management personnel.

■ Plaintiff argues that, nonetheless, numerous cases stand for the proposition that one of the ways in which a qualified privilege may be lost is if the publisher lacked a belief or a reasonable ground for belief in the truth of the defamatory statement. *See, e.g., Benassi v. Georgia Pacific*, 62 Or App 698, 703, 662 P2d 760, *mod on recons* 63 Or App 672, 667 P2d 532, *rev den* 295 Or 730 (1983). However, a variation on that rule applies in situations where a person who republishes a defamatory statement does so under circumstances that make it clear that it is an allegation, not a fact, that is being repeated. In *Cooper v. PGE*, 110 Or App 581, 824 P2d 1152, *rev den* 313 Or 209 (1992), we addressed arguments that are virtually identical to those made by plaintiffs here. In *Cooper*, the plaintiff worked for a subcontractor of the defendant PGE at a location that required a security clearance from PGE. 110 Or App at 583. An informant told PGE that the plaintiff was involved in drug dealing, and on the basis of that information PGE suspended the plaintiff's security clearance. *Id.* at 583-85. PGE repeated the allegation about drug dealing to the plaintiff's employer, and the plaintiff was dismissed. We

concluded that trial court properly granted summary judgment in PGE's favor, for the following reasons:

> "[E]ven if it did lack reasonable grounds for [belief in the truth of the statements], there is another basis for holding that PGE did not abuse its privilege. *Restatement (Second) of Torts* § 602 says:
>
> " 'One who upon an occasion giving rise to a conditional privilege publishes a defamatory rumor or suspicion concerning another does not abuse the privilege, even if he knows or believes the rumor or suspicion to be false, if
>
> " '(a)   he states the defamatory matter as rumor or suspicion and not as fact, and
>
> " '(b)   the relation of the parties, the importance of the interests affected and the harm likely to be done make the publication reasonable.'
>
> "Here, the alleged defamatory statements were not that PGE knew as a fact that plaintiff was a security risk; rather, the essence of the statements was that PGE had received information that indicated that plaintiff's presence in the Trojan nuclear plant would constitute a security risk." *Cooper*, 110 Or App at 590-91 (footnote omitted).

The present case is analogous to *Cooper*. Pope discussed Bellafronto's accusations against plaintiff with management in order to determine if something should be done about them. Rather than presenting Bellafronto's accusations as fact, Pope indicated to those to whom he communicated that he did *not* believe the accusations against plaintiff. Legitimate reasons for repeating Bellafronto's statements to P&T management were present here; statements made by disgruntled former employees accusing a person within a company of wrongdoing are, necessarily, "on a subject of mutual concern to" an employer and its top management. *Wattenburg*, 269 Or at 380. If merely repeating an accusation that has been made in the context of determining what should be done about it constituted defamation, then employers would be severely crippled in their abilities to verify rumors and accusations by employees about management, or about employees by management, for that matter.

The statements from Bellafronto's letter that Pope repeated to P&T management were subject to a qualified

privilege, and plaintiff produced no evidence that the privilege had been abused. The trial court properly granted defendants' motion for summary judgment on plaintiff's defamation claim.

Affirmed.