Yasuko ISHIKAWA, Plaintiff,

v.

DELTA AIR LINES, Incorporated, a Georgia corporation, and LabOne, Inc., a Delaware corporation, Defendants.

No. CV 00–1284–PA.

United States District Court, D. Oregon.

June 27, 2001.

Gregory Kafoury, Mark G. McDougal, Kafoury & McDougal, Portland, OR, Linda K. Williams, Portland, OR, for Plaintiff.

Corbett Gordon, Corbett Gordon & Associates, P.C., Portland, OR, Andrew J. Fisher, Kelly Kubes, Delta Air Lines, Inc., Atlanta, GA, for Defendant Delta Air Lines, Inc.

John E. Hart, Kimberlee Collins Morrow, Hoffman, Hart & Wagner LLP, Portland, OR, for Defendant LabOne, Inc.

## OPINION

PANNER, District Judge.

Plaintiff, Yasuko Ishikawa, brings this action against LabOne and Delta Air Lines, alleging claims for defamation, negligence, misrepresentation, and wrongful discharge. Defendant LabOne moves for summary judgment against each of plaintiff's claims against LabOne, and defendant Delta Air Lines (Delta) moves for summary judgment against each of plaintiff's claims against Delta. For the reasons that follow, I deny LabOne's motion for summary judgment, and I grant Delta's motion for summary judgment.

## LABONE'S MOTION FOR SUMMARY JUDGMENT

### FACTUAL BACKGROUND

Plaintiff was employed by defendant Delta Air Lines as a flight attendant. In September 1999, plaintiff was scheduled to work the route between Portland, Oregon and Nagoya, Japan. On September 20, 1999, plaintiff received an in-flight notification from Delta that she would be required to submit to a random, routine drug test upon her arrival to Portland International Airport. Plaintiff provided a urine sample under the conditions specified by Delta and the sample collector. The sample was tested for temperature to detect adulteration, and then the sample collector forwarded the sample to LabOne.

LabOne reported that the preliminary results indicated that plaintiff's urine sample was of a specific gravity of 1.0, that the creatinine level was 5, and that LabOne therefore would not analyze the sample for the presence of controlled substances because the sample was substituted. Delta terminated plaintiff after LabOne reported to the Medical Review Officer for Delta that plaintiff's urine sample was "substituted."

Dr. Michael Peat of LabOne was responsible for the Substance Abuse Testing Division of LabOne between June 1994 and December 2000.

In September 1998, the federal government issued Program Directive No. 35, which provided that a urine specimen was "decreed ... a substituted specimen" if it "had a creatinine [level] of 5 or less ...." Dr. Peat acknowledged that under that directive, a creatinine level of 5.1 would not be a failure. LabOne used an Olympus machine to measure concentrations of creatinine and the Olympus machine could be set to report whole numbers or to report numbers to a decimal point. In September 1998, after LabOne implemented Directive No. 35, the machine was set to report whole numbers. Dr. Peat understood that under the federal regulations, reporting a creatinine level of "5" would be "considered a refusal to test" and that people would lose their jobs as a result. Dr. Peat knew that there was a category of people who could be fired from their jobs because LabOne set the Olympus machine to round off the creatinine level to a whole number, rather than carrying out the creatinine level to a decimal point. Dr. Peat stated that this category of persons would have passed the drug test from a regulatory point of view, but LabOne reported them as having submitted a substituted sample. LabOne did not tell Delta that those persons he reported as having a creatinine level of 5 may have passed the regulatory test or that the machine was set to round off to whole numbers.

LabOne reported plaintiff's creatinine level as 5, and plaintiff was terminated by Delta because this report indicated that she had submitted a substituted sample under the federal drug testing regulations.

In or about January 2001, plaintiff accepted Delta's offer of re-employment with full backpay and benefits.

Plaintiff alleges that LabOne was negligent in its analyzing and reporting of the results of her urine sample by:

a. Failing to record and report measurements beyond the decimal point;

b. Analyzing plaintiff's urine sample on a device not designed for accurate analysis of urine, namely a device designed to test blood serum and not certified to test urine;

c. Failing to properly calibrate the device used to analyze plaintiff's urine and failing to run control samples relevant to urine test parameters;

d. Failing to maintain the test device so that it would provide read outs within plus or minus two standard deviations;

e. Failing to adequately maintain corrective action logs necessary to determine accuracy of results and machine corrections thereto; and/or

f. Failing to maintain integrity of records through audit to prevent employee falsification of data and logs.

As a result of these negligent acts, plaintiff alleges that LabOne negligently misrepresented the results of plaintiff's urine test as "substituted" when it knew that the results were neither accurate nor consistent with a finding of "substitution." Because of this negligent misrepresentation by LabOne, plaintiff alleges that Delta terminated her employment. Additionally, plaintiff alleges that LabOne recklessly misrepresented the results of plaintiff's drug test to Delta, and that LabOne's misrepresentation was relied on by Delta to terminate plaintiff's employment. Plaintiff seeks punitive damages in addition to compensatory damages.

## STANDARDS

The court should grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The court should resolve reasonable doubts about the existence of a material factual issue against the moving party. *Id.* at 631. The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *Id.* at 630–31.

## DISCUSSION

In support of its motion for summary judgment, LabOne contends (1) that plaintiff's claims for negligence and misrepresentation are preempted by the federal drug testing regulations; (2) that plaintiff's misrepresentation claim fails because plaintiff has failed to establish that a special relationship existed between plaintiff and LabOne; and (3) that plaintiff's claim for punitive damages should be dismissed because there is no evidence to support a

finding of wanton, malicious or intentional conduct.

### 1. Preemption

 LabOne incorporates by reference the legal arguments it made in support of its motion to dismiss regarding private right of action and preemption. Plaintiff responds that the court should not revisit this issue because LabOne has offered no new authority and the court rejected the same arguments in denying LabOne's motion to dismiss. In its reply brief, LabOne reiterated in large part the legal arguments made in support of its motion to dismiss, which as plaintiff points out, I previously analyzed and rejected LabOne's arguments. I conclude that LabOne has offered no new authority in support of its motion for summary judgment on the issue of preemption that convinces me that my previous decision in denying LabOne's motion to dismiss is erroneous. Therefore, LabOne's motion for summary judgment in this respect is denied.

### 2. Misrepresentation Claim

LabOne contends that plaintiff's claim for misrepresentation fails because plaintiff did not rely on any representation by LabOne and plaintiff has failed to establish that she had a special relationship with LabOne. Plaintiff responds that she has adequately pleaded a claim for misrepresentation because she relied on LabOne to accurately test and report her urine sample. Plaintiff also contends that she was the intended third-party beneficiary of the relationship between Delta Air Lines and LabOne, and as an intended beneficiary, LabOne owed her a duty to exercise reasonable care to avoid misrepresenting facts.

 Plaintiff's claim for misrepresentation is governed by Oregon law. The elements of misrepresentation are: "(1) a representation; (2) its falsity; (3) its mate-riality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Webb v. Clark*, 274 Or. 387, 391, 546 P.2d 1078 (1976) (citations omitted). Under certain circumstances, a defendant may be liable for economic loss sustained by a plaintiff who relies on a defendant's representations negligently made. *See Onita Pacific Corp. v. Trustees of Bronson*, 315 Or. 149, 159, 843 P.2d 890 (1992). However, such a claim must be based upon a duty of care beyond the general common-law duty to prevent foreseeable harm. *Id.* Courts in Oregon examine each case on its own facts to determine whether the type of relationship between the parties establishes this heightened duty. *Id.* The Oregon courts have examined several types of professional relationships, including relationships involving a nongratuitous supplier of information and the duty of care owed to an intended third-party beneficiary of a contractual, professional or employment relationship. *See id.* For example, the Oregon Court of Appeals has held that the plaintiff buyers of a house were intended beneficiaries of the contract between the sellers and the defendant inspector to inspect the roof. *Meininger v. Henris Roofing & Supply of Klamath County, Inc.*, 137 Or.App. 451, 454, 905 P.2d 861 (1995). The plaintiff buyers relied on the inspection report in deciding to buy the house. When the roof leaked, the plaintiff buyers sued the defendant inspector for misrepresentation. The court concluded that the plaintiff buyers were the intended third-party beneficiaries to the contract between the sellers and the defendant inspector because the purpose of the inspection report was to provide an opinion about the

condition of the roof to potential buyers of the house and because the inspection report would be used in part to further the economic interests of the plaintiff buyers. *Id.*

The facts of this case are analogous. Delta entered into a contract with LabOne for the professional service of drug testing of Delta employees. Under Oregon law, employees like plaintiff would be intended beneficiaries to that sort of contract because employees have an economic interest in accurate drug testing and reporting of test results. LabOne was acting, at least in part, to further the economic interests of Delta's employees, because an inaccurate report that an employee failed a drug test would have significant adverse economic consequences to an employee. Similarly, an accurate report that an employee did not use drugs would act, at least in part, to further that employee's economic interest in maintaining his or her job with Delta. In this case, the evidence shows that LabOne knew that the test reports would be used in Delta's employment decisions and that inaccurate reports could result in the termination of an employee.

However, a factual issue remains, namely, whether plaintiff relied on a representation made by LabOne. In *Weininger*, the plaintiff house buyers relied on the inspector's report to make their decision to buy the house. In this case, the facts are unclear whether plaintiff acted in anyway based on a representation made by LabOne. Viewing the evidence and all reasonable inferences in plaintiff's favor, I am satisfied that LabOne's motion for summary judgment on plaintiff's misrepresentation claim should be denied. I will revisit this issue at the appropriate time during trial.

### 3. Punitive Damages

LabOne also moves for summary judgment on plaintiff's claim for punitive damages. LabOne contends that plaintiff alleges that LabOne was merely negligent in performing the drug testing at issue in this case, and that plaintiff is unable to prove a degree of culpability greater than inattention. Plaintiff responds that Dr. Peat, the responsible person for LabOne, allowed the Olympus machine to round off numbers even after Program Directive 37 was issued, which required that creatinine levels be carried out to one decimal point. Plaintiff contends that Dr. Peat knew that a category of persons would pass the test from a "regulatory point of view" but that even a level of creatinine slightly above 5 was not sufficient for him. Plaintiff also contends that Dr. Peat truncated the creatinine number without informing the Medical Review Officer for Delta.

At this point, I deny LabOne's motion for summary judgment on the punitive damages claim. I will revisit this issue at the appropriate time during trial.

### DELTA'S MOTION FOR SUMMARY JUDGMENT

Delta moves for summary judgment against each of plaintiff's claims brought against Delta. In response to the arguments raised by Delta's motion, plaintiff has expressly abandoned her first claim for defamation involving compelled publication, her wrongful discharge claim and her negligence claim. Therefore, the only claim remaining for discussion is plaintiff's claim for defamation regarding several statements made by Delta and/or its employees.

### FACTUAL BACKGROUND

This section supplements the factual background presented above, and it focuses on the facts relevant to plaintiff's remaining claim for defamation.

Federal law requires that flight attendants submit to random drug testing by

their employers. In September 1999, Delta contracted with LabOne to perform drug testing on urine samples submitted by Delta's employees in compliance with the federal drug testing regulations. In September 1999, Delta also contracted with Dr. William Whaley to perform the federally mandated duties of Medical Review Officer (MRO). An MRO receives the test results from the laboratory. If the test result indicates that prohibited drugs were present in the sample, then the MRO would be responsible for contacting the employee and for determining whether a legitimate medical reason existed to explain the presence of drugs.

Delta has a policy of terminating employees for the use of illegal drugs or for a refusal to test, which includes a finding of a substituted sample.

A validity test is conducted on a urine sample to detect whether the sample was tampered with by the employee. Under the federal regulations, a urine sample is reported as "substituted" if the laboratory reports a creatinine level of equal to or less than 5mg/dl, and a specific gravity of equal to or less than 1.001 or equal to or greater than 1.020. Under the federal regulations, a test result of a "substituted sample" is treated as a refusal to test.

On September 20, 1999, plaintiff received an in-flight notification that she would be required to submit a urine sample for a random drug test upon her arrival at Portland International airport. Plaintiff used the bathroom at least once before the airplane landed. Plaintiff submitted a urine sample, and she did not identify any problems with collection of the sample. Plaintiff also signed the custody and control form, affirming that she had not tampered with the sample. LabOne reported that the sample was "substituted" because it failed the validity test.

On September 25, 1999, Delta's MRO, Dr. William Whaley, contacted plaintiff and told her there was a problem with her test. Plaintiff told Whaley what she ate and drank on September 20, 1999. Plaintiff also fully disclosed all medications, vitamins, and health-food supplements that she was taking at that time. Plaintiff did not fully understand what Whaley told her about her test, but plaintiff believed that Whaley said her sample "was diluted" and "it was too thin for human urine." Whaley reported to Delta that plaintiff's urine sample was "substituted" and a "refusal to test."

Plaintiff is a small woman, standing approximately 5'3" tall and weighing less than 100 pounds. Plaintiff eats a traditional Japanese diet, which consists largely of soy products with no red meat or dairy products. Just prior to September 20, 1999, plaintiff had returned to work from a medical leave for surgery.

After LabOne reported that plaintiff's urine sample was substituted, Delta suspended plaintiff pending review. Delta then terminated plaintiff's employment because LabOne reported that she had submitted a substituted sample, which constitutes a refusal to test.

Plaintiff discussed with numerous people her termination from Delta and the test result that her urine sample was not human urine, that there was a problem with her drug test and that the test indicated that she had diluted or substituted her sample. Plaintiff asked other Delta employees to write letters on her behalf to Delta, and other employees volunteered to write letters after plaintiff told them of her experiences. To help her explain to others what happened, plaintiff prepared a narrative account of the events. Plaintiff discussed her drug test, the test results and her termination in email messages with numerous people, in television and radio appearances, in media interviews, and in various telephone calls with a variety of

people including the media, union leaders and members of Congress. Plaintiff knew that other Delta employees became concerned about Delta's drug testing program because she regularly discussed her situation with numerous people.

Plaintiff admits that Delta was justified in making truthful statements about its drug testing program and about her situation, and she admits that Delta should terminate employees who tamper with their urine samples if it can be shown that they did tamper with the samples. Plaintiff believes that Delta is a good company that made a mistake.

After plaintiff was terminated and she began her campaign to inform other Delta employees and the public of her situation, Delta made presentations to large groups of employees regarding Delta's drug testing program. At least one employee believed that the presentation was about plaintiff even though Delta never expressly discussed plaintiff's situation or mentioned her name. At a large group meeting in Portland, Dr. Miles Snowden stated that "he could sleep well at night" and he knew that LabOne was "100% accurate."

In February 2000, Delta published a flyer entitled "MYTH Blaster" for internal distribution to employees that stated that "[u]nder Federal regulations, a single mistake by the lab can cause the lab to be decertified. Nothing less than 100% accuracy is acceptable, and the laboratories used by Delta have never been decertified."

In April 2000, Eric Moon, a Delta supervisor based in Los Angeles, told another employee, Gwen Jones–Cleary, that plaintiff had "cheated," "altered" and "added something to her sample." Later that same day, Mary Hamilton, another Los Angeles-based supervisor, stated to Jones–Cleary and another supervisor that plaintiff and another employee had "altered their sample[s]" and that Delta had terminated them for other reasons in their personnel files.

In September 2000, Dr. Miles Snowden, Delta's Regional Medical Director, visited LabOne with a drug testing laboratory inspector and Delta's MRO to inspect laboratory documents and to interview LabOne representatives. Dr. Snowden and the others concluded that LabOne had problems. In October 2000, Delta terminated its contract with LabOne.

On or about October 10, 2000, Delta offered to re-employ plaintiff with full back pay, seniority, and benefits. Soon thereafter, LabOne cancelled plaintiff's test because of the way LabOne measured the creatinine levels. Delta has paid plaintiff $68,920.26 in back wages and benefits, and plaintiff has returned to Delta's payroll.

## DISCUSSION

In her first amended complaint, plaintiff alleges that Delta and/or its employees made several false statements. In opposition to Delta's motion for summary judgment as to each of the alleged defamatory statements, plaintiff defends her allegations for six of those statements. Thus, the statements now at issue are (1) Dr. Miles Snowden's statement at a Portland meeting regarding LabOne's accuracy; (2) a statement in the MYTH Blaster flyer that Delta would not accept inaccuracy in drug testing; (3) Darryl Cooper's statement that plaintiff admitted taking drugs; (4) Eric Moon's statement that plaintiff "cheated," "altered" and "added something to her urine sample"; (5) Mary Hamilton's statement that there were other reasons in plaintiff's file to terminate her; and (6) Dale Williams' statement that he was sure that plaintiff was lying about tampering with her sample.

As the Oregon Supreme Court recently explained:

A defamatory communication is one that would subject another to

"... hatred, contempt or ridicule... [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other]."

To be actionable, a communication must be both false and defamatory. The court, rather than the jury, determines whether a communication is capable of a defamatory meaning. In making that determination, the court looks to the context in which the communication was made. A communication can be defamatory on its face. Even a communication that is not defamatory on its face may be defamatory if a reasonable person could draw a defamatory inference from the communication.

Defamation by implication is the label commonly given to a claim that requires drawing a defamatory inference from a facially nondefamatory communication. When defamation by implication is alleged, the link between the communication and the defamatory inference must not be "too tenuous." In other words, when a claim for defamation requires the drawing of a defamatory inference, the inference that the plaintiff seeks to draw from the facially nondefamatory communication must be reasonable.

*Reesman v. Highfill*, 327 Or. 597, 603–04, 965 P.2d 1030 (1998) (internal citations omitted).

■ Privileged communication is not actionable unless the speaker abuses the privilege. A qualified privilege protects certain statements made by employers to their employees if (1) the statement was made to protect the interests of the employer; or (2) the statement was made on a subject of mutual concern to the employer and the employees to whom the statement was made. *See Wattenburg v. Unit-*

*ed Medical Lab.*, 269 Or. 377, 380, 525 P.2d 113 (1974). This qualified privilege may be abused if the speaker does not believe in good faith that the statement is true or if the speaker lacks reasonable grounds to believe that the statement is true. *Cooper v. PGE*, 110 Or.App. 581, 590, 824 P.2d 1152 (1992). To survive a motion for summary judgment on this issue, a plaintiff must offer some evidence creating an issue of fact about the mental state of the speaker at the time the statement was made. *Bickford v. Tektronix, Inc.*, 116 Or.App. 547, 551, 842 P.2d 432 (1992).

*1. Snowden's Statements regarding LabOne's Accuracy*

■ Plaintiff contends that Dr. Miles Snowden stated that "he could sleep well at night" and he knew that LabOne was "100% accurate." Delta argues that these statements are protected by qualified privilege. Plaintiff contends that the statement that LabOne was 100% accurate is not protected by qualified privilege because Dr. Snowden did not have a reasonable basis to believe that LabOne was 100% accurate.

The statement by Dr. Snowden that LabOne was 100% accurate does not reference plaintiff. However, given the context of the Portland meeting, Snowden's statement that LabOne was 100% accurate does create a reasonable implication that LabOne was accurate in its testing of plaintiff's urine sample and therefore plaintiff substituted her urine sample.

However, Snowden's statement is protected by qualified privilege unless plaintiff establishes that Snowden abused the privilege. Plaintiff contends that because Snowden lacked "a good faith belief that the validity tests conducted by LabOne were 100% accurate when he stated they were." Plaintiff must present some evidence regarding Dr. Snowden's state of

mind and his belief at the time he stated that LabOne was 100% accurate. To this end, plaintiff relies in part on testimony from Dr. Whaley, the MRO for Delta in September 1999, that Delta submitted blind samples to LabOne to test LabOne's drug-testing accuracy. Whaley's testimony establishes only that Dr. Whaley did not submit blind samples to test the accuracy of LabOne's validity testing. Plaintiff also relies on Dr. Snowden's testimony in which he explained that he called Dr. Whaley in September 1999 to check that Whaley had adequately verified plaintiff's test results. Snowden's testimony also indicates that at the time of his deposition in this case, May 15, 2001, Snowden knew that the federal regulations did not require Delta to send blind test samples to ensure the laboratory's testing system for creatinine and specific gravity in 1999. This testimony does not establish what Snowden knew at the time he stated that LabOne was 100% accurate. Plaintiff also relies on the testimony of Veronica Greene, Delta's Substance Abuse Program Manager, but that testimony merely establishes that at the time of her deposition on May 1, 2001, Greene knew that Delta's "the blind proficiency process" in September 1999 did not include "blind testing for the validity parameters." The record does not establish that Dr. Snowden lacked a good faith belief or that Snowden lacked reasonable grounds for his belief that LabOne was 100% accurate in September or October 1999. Plaintiff has failed to raise an issue of fact regarding Snowden's belief or the grounds for his belief at the time he made the statement. Consequently, I grant Delta's motion for summary judgment with respect to Dr. Snowden's statement about LabOne's accuracy.

### 2. MYTH Blaster Statements

Plaintiff contends that the statement "[n]othing less than 100% accuracy is acceptable" published in the February 2000 edition of the MYTH Blaster defamed plaintiff. As Delta argues, this statement does not specifically refer to plaintiff or any other individual or group of individuals. Delta contends that this statement is not capable of a defamatory meaning and no reasonable defamatory inference can be drawn from this statement. I agree that plaintiff has failed to establish that this statement was false or defamatory. The statement is also protected by the qualified privilege, and plaintiff has failed to establish or raise a material issue of fact that in February 2000, Delta lacked a good faith belief or reasonable grounds for the belief that nothing less than 100% accuracy was acceptable to Delta. For these reasons, I grant Delta's motion for summary judgment with respect to the statement in the MYTH Blaster.

### 3. Cooper's Statement: Plaintiff Admitted Taking Drugs

Plaintiff contends that Daryl Cooper, a urine collector for Delta, stated that plaintiff admitted taking drugs and that her drug use was the reason for her termination. As Delta contends, plaintiff has failed to present any evidence that Cooper made these statements, and therefore, I grant Delta's motion for summary judgment with respect to Cooper's statements.

### 4. Moon's Statement: Plaintiff Cheated, Altered and Added Something

Plaintiff alleges that Eric Moon, a supervisor, stated that plaintiff cheated, altered and added something to her urine sample. Delta contends that Moon's statements are protected by qualified privilege. Plaintiff contends that Moon abused any privilege that protected these statement because Moon could not have reasonably believed that plaintiff had cheated, altered her sample and added something to her sample based on the finding of a substitut-

ed sample. As Delta contends, the test result that plaintiff submitted a substituted urine sample that was not consistent with human urine is reasonable grounds for Moon's belief that plaintiff cheated or attempted to cheat on the drug test and that plaintiff altered her urine sample or added something to her urine sample. Plaintiff has presented no evidence that Moon did not in good faith believe that plaintiff had cheated, altered and added something to her urine sample. At the time of Moon's statements, Moon had no reason to believe that LabOne's report that plaintiff submitted a substituted urine sample was inaccurate. Therefore, I grant Delta's motion for summary judgment with regard to Moon's statements.

### 5. Hamilton's Statement: Other Reasons for Termination

Plaintiff contends that Mary Hamilton, Delta Supervisor, told another flight attendant that plaintiff and another flight attendant altered their samples and that they were terminated for other reasons in their files. Delta contends that these statements are not capable of defamatory meaning because, as an at-will employee, plaintiff could be terminated for any reason. Delta also contends that Hamilton's statement about "other reasons" is too vague to be defamatory. Delta further contends that Hamilton's statements are privileged and plaintiff has failed to establish that Hamilton abused the privilege. I agree with Delta that this statement is too vague to be capable of defamatory meaning. The record indicates that plaintiff was an at-will employee and Delta could terminate her employment for any reason. Without some indication of what the "other reasons" were, the statement is not capable of defamatory meaning. Moreover, Hamilton's statement is protected by qualified privilege, and plaintiff has failed to establish that Hamilton lacked a good faith belief or reasonable

grounds for the statement that plaintiff was terminated for other reasons. Consequently, I grant Delta's motion for summary judgment with respect to Hamilton's statement.

### 6. Williams' Statement: 100% Sure that Plaintiff was Lying

Plaintiff contends that Dale Williams, a Delta Advisory Board representative, stated that he was 100% sure that plaintiff was lying about tampering with her sample. Plaintiff has failed to present any evidence that Williams made the alleged statement. Therefore, I grant Delta's motion for summary judgment with respect to Williams' statement.

### CONCLUSION

Defendant LabOne's Motion for Summary Judgment (# 38) is denied, and defendant Delta Air Lines' Motion for Summary Judgment (# 32) is granted.

### ORDER

Defendant LabOne's Motion for Summary Judgment (# 38) is denied, and defendant Delta Air Lines' Motion for Summary Judgment (# 32) is granted.