Argued January 10, affirmed August 8, 1974

WATTENBURG, *Respondent, v.* UNITED
MEDICAL LABORATORIES, INC. ET AL, *Appellants.*
525 P2d 113

*Ridgway K. Foley, Jr.,* Portland, argued the cause for appellants. With him on the briefs were Souther, Spaulding, Kinsey, Williamson & Schwabe, Gordon Moore, Morrison, Bailey, Dunn, Cohen & Miller, Thomas E. Cooney and Howard K. Beebe, Portland.

*James H. Clarke,* Portland, argued the cause for respondent. With him on the brief were Dezendorf, Spears, Lubersky & Campbell, Wayne Hilliard, Stanley Loeb and Vawter Parker, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER,[*] DENECKE, HOLMAN, HOWELL and BRYSON, Justices.

DENECKE, J.

The jury returned a verdict for the defendants in this slander case. The trial court, however, granted the plaintiff's motion for a new trial upon the ground that one of the defendants' attorneys made an improper closing argument. The defendants appeal.

The defendants contend that the trial court erred in denying their motion for a directed verdict. If the defendants are correct, whether the trial court erred in ordering a new trial becomes immaterial.

The defendants admit the utterance of the defamatory statements. The issues on the motion for a directed verdict are whether the utterance was conditionally privileged and, if so, whether there was evidence that the defendants made the statement with malice, thus destroying the protection of the privilege.

■ A defamatory statement is privileged if it is uttered under such circumstances that the law grants immunity to the speaker. The privilege is conditional rather than absolute because the privilege is lost if the statement is made maliciously.

If the occasion was one for privileged speech, there was evidence of malice. For this reason the trial court was correct in denying the motion for a directed verdict.

■ Whether the statement was made maliciously depends at least in part on whether the statement was

---

* McAllister, J., did not participate in this decision.

made for the purpose for which the privilege was created. For this reason it is necessary to state the basis on which defendants contend the statement was privileged.

■ A statement is conditionally privileged if: (1) it was made to protect the interests of defendants; (2) it was made to protect the interests of plaintiff's employer; or (3) it was on a subject of mutual concern to defendants and the persons to whom the statement was made. 3 Restatement 242, Torts §§ 594-596. Defendants contend the statement in this case was privileged for all of these reasons.

■ The malice required is something more than "implied" or "legal" malice. The plaintiff must offer evidence of some kind of improper motive on defendant's part.

The defendant United Medical Laboratories (UML) is a Portland based clinical testing laboratory to which physicians send blood, urine, etc., for testing. The defendant Michel is the president, founder and chief officer of UML. The plaintiff and a colleague founded Berkeley Scientific Laboratories (BSL) which designs computer systems for medical testing facilities. In 1968 BSL was sold to Tracor and plaintiff remained with BSL under an employment contract.

BSL did special engineering work for UML and sold it several systems. Plaintiff represented BSL in at least some of these transactions. In the latter part of 1969 BSL contracted with UML to furnish a hematology data analysis system and a programming system for a total price of $179,000. Plaintiff represented BSL in the sale.

BSL and plaintiff learned that defendants con-

sidered this contract for purchase to be revocable. Plaintiff came to Portland to dissuade defendants from canceling their contract. On January 26, 1970, defendants executed a letter agreement in which defendants promised not to cancel the order but to change the system to be purchased to a Clindata system. In June 1970, however, defendants canceled the January order. Subsequently, the parties negotiated in an attempt to resolve the controversy over the cancellation of this order.

Dr. Larsen is an executive of UML. He had some role in the decision to purchase the Clindata system from BSL. Mr. Dexter was a vice president for laboratory operations for UML.

Dr. Larsen was in Sweden in 1969. He met a Swedish girl who was trying to find a position in the United States. When Dr. Larsen returned to the United States and was at BSL he told plaintiff about the girl and her desire for a job. Plaintiff had the personnel department investigate and as a result the girl came to the United States and was hired by BSL.

Dr. Larsen testified that in August or September 1970 he received a telephone call from plaintiff. He testified plaintiff told him he wanted his help in persuading UML to accept the system they had ordered because if UML did not plaintiff would be in trouble with the concern that purchased BSL, that is Tracor. Dr. Larsen also testified that plaintiff told him plaintiff knew Dr. Larsen had a problem with this Swedish girl because Larsen had made a trip to Norway with her; that if this got back to the defendant Michel, Larsen would get fired. Larsen replied that he had nothing to hide in his relationship with the Swedish girl.

Mr. Dexter testified that in September 1970 he received a telephone call from plaintiff. Dexter testified plaintiff said there was a problem with Dr. Larsen and a Swedish girl "and it could get very sticky, and the way to solve the whole situation was to take the system [Clindata] and he would do his best to keep the situation quiet at B.S.L. and U.M.L."

There was evidence that Dexter told Michel of the threats and that Larsen told Michel either that plaintiff had threatened him or that Dexter had told Larsen that plaintiff had told Dexter plaintiff might expose Larsen.

On October 13, 1970, plaintiff wrote UML that an agreement had to be reached in their controversy about the Clindata system by October 20th. On October 19th the president of Tracor sent two Tracor executives, Messrs. Hubbard and Schutt, to Portland to meet with UML and discuss the controversy. In the course of the ensuing discussions, Michel and Dexter testified that the Tracor executive asked "why do you want to get out of this business relationship," or words to that effect. Michel replied that plaintiff was attempting blackmail or exerting unethical pressure against Dr. Larsen in an attempt to get UML to accept the Clindata system. Later, in the same meeting, Michel repeated the accusation.

That same day Mr. Hubbard, the Tracor executive who was conferring with Michel, called plaintiff and relieved him of his duties as chief executive of BSL.

There was evidence that in the fall of 1970 UML restricted its purchases for financial reasons. There was also evidence that by 1970 UML was developing

the capabilities of producing an analysis system similar to the kind sold by BSL.

Plaintiff contends that there was evidence from which the jury could find the defendant Michel did not believe that the plaintiff had tried to blackmail Dr. Larsen. All agree, except in circumstances not here relevant, that if the one who publishes does not believe the statement uttered, the publisher has acted maliciously.

Section 600, 3 Restatement 264, Torts, states:

"Except as stated in § 602, one who upon a conditionally privileged occasion publishes false and defamatory matter of another abuses the occasion if he does not believe in the truth of the defamatory matter."

Prosser states the principle: "Finally, since there is no social advantage in the publication of a deliberate lie, the privilege is lost if the defendant does not believe what he says." Prosser, Law of Torts (4th ed) 795, § 115.

■ The plaintiff has the burden of proving malice. The question then narrows down to whether there is evidence from which the jury could find the defendant Michel did not believe plaintiff had attempted to blackmail Dr. Larsen.

The defendants appear to be of the opinion that the evidence is conclusive that Michel made the defamatory statements because he had been told by at least Dr. Larsen and Mr. Dexter that plaintiff had attempted to blackmail Dr. Larsen. We conclude this is incorrect because the jury did not necessarily have to find that Larsen and Dexter so informed Michel.

The testimony of Larsen, Dexter and Michel was

that Larsen and Dexter told Michel about plaintiff's attempted blackmail. Their testimony was not directly contradicted. This is not an instance, however, in which uncontradicted evidence requires the jury to find that Larsen and Dexter did so inform Michel.

■ We have followed the rule stated in *Rickard v. Ellis*, 230 Or 45, 52, 368 P2d 396 (1962);

> "It is evident from the foregoing statement of the principle that whether uncontradicted testimony is such as to preclude the jury's function in testing the credibility of the witness or witnesses who gave it will depend upon the nature of the issue in the particular case which the testimony purports to resolve. Two important factors in determining whether the jury should be permitted to disbelieve the witness and draw an inference contrary to the uncontradicted testimony given are (1) the availability of evidence to contradict the witness's statement, and (2) the likelihood that the witness's interest in the litigation may tempt him to testify falsely." *Accord, Foster v. Agri-Chem, Inc.*, 235 Or 570, 575-576, 385 P2d 184 (1963); *Palmer v. Van Petten Lbr. Co.*, 265 Or 347, 349, 509 P2d 420 (1973).

■ These two factors are significant in the present case as they were in *Rickard v. Ellis*, supra. There is little likelihood that there would be any evidence available to plaintiff to contradict the evidence of these three witnesses about conversations among themselves. Two of the three witnesses were associated with UML, one of the defendants, at the time of trial; the other had been chief executive officer of UML until a short time before. One of the witnesses is a defendant.

In addition to these two factors, there are other reasons found in the evidence why a jury would not

have to find in accordance with the uncontradicted testimony of these three witnesses.

The testimony of Michel as to what he was told by Dexter and Larsen differs somewhat from what Dexter and Larsen testified they told Michel.

The evidence is that Michel heard Dexter's and Larsen's story in latter August or early September. No attempt was made to investigate their report or bring it to the attention of plaintiff, BSL or Tracor, yet on October 19th Michel told Tracor plaintiff's action was the reason for breaking off relations with BSL.

The plaintiff testified he did not attempt to blackmail Larsen or to exert unethical pressure to accept the Clindata system. He denies he made any statements that could be so interpreted. While this is not directly contradictory of Larsen's and Dexter's testimony that they told Michel plaintiff attempted blackmail, it could be regarded by a juror of "reason and fairness" to effectively contradict such testimony. The jurors could reason that if Larsen and Dexter lied about their conversation with plaintiff, they likewise lied about repeating such conversations to Michel.

The jury could find Michel's motive in making the defamatory statements to be other than to protect the interests of the defendants, BSL or both of them. The jury could find the defendants' motive was to avoid the obligation of a contract. There was evidence Michel believed the purchase would be bad business judgment on the part of UML and Michel could influence Tracor executives to refrain from attempting to enforce the contract.

We hold the trial court was correct in denying the motion for a directed verdict.

■ We also hold the trial court did not err in granting a new trial.

About a year after Michel's conference with the Tracor executives a book written by plaintiff was published. The title is "How to Find and Fascinate a Mistress." The book sold well. Plaintiff appeared on at least one national television show in his capacity as author of this book.

On the voir dire examination of the first juror counsel for one of the defendants asked about the book and plaintiff's counsel objected. On both direct and cross-examination of plaintiff's witnesses some aspects of the book were brought out. The trial court refused defendants' offer of the book into evidence. Throughout the trial the trial court attempted to lay down guidelines concerning what aspects of the book were admissible and could be alluded to and what was taboo.

Plaintiff called plaintiff's wife as a witness. Plaintiff had testified she had contributed ideas for the book. On cross-examination, she answered "yes" to the question: "It deals with man's private parts and every reference to it, and things like that?"

At the close of his opening argument plaintiff's counsel brought up the book and mentioned how defendants' counsel "has acted from the start as though when you mention sex it is a bad word * * *. That is not the issue in this case at all."

Defendants' counsel stated in his closing argument:

"* * * I suppose I am supposed to start out defending myself, and I will defend myself by making things clear.

"Ladies and gentlemen, to know what is in a person's mind is found by studying his works. And

since counsel has not seen fit to tell you what kind of book this is, of course, he did not want to make it available for you to see."

Plaintiff's counsel objected and after discussion the court stated to defendants' counsel: "Limit your remarks to the evidence." Defendants' counsel then argued to the jury:

"The evidence shows that there is not one page in this book that does not deal with man's private parts and man's penis, and what to do with the private parts. That is what the book shows, and I want to tell you what the book shows. And I think we know an author by knowing what is in his mind.

"He can stand up and say to you, 'I am Will Harvey. I am not me. This is not me. This is Will Harvey." [a pseudonym used by plaintiff in writing the book].

"I am not impressed. That was William Wattenburg and not some imaginary somebody. Fine. But this was the same mind, the same person and the same acts of Dr. Wattenburg would do, and by his works you will know him.

"We are dealing with a man, a brilliant man, and there is no question but what God gave to this man ability He did not give to the average person, and with that ability goes responsibility to use these abilities. But here is a man who has misused those abilities."

Plaintiff did not object or move for a mistrial.

The trial court was of the opinion that the argument went outside the evidence and was irrelevant and prejudicial. The book created a delicate problem for the trial court. That the plaintiff was the author, that it dealt with sex and that it was well known had relevance on the issue of why Tracor relieved plaintiff of his duties with BSL. On the other hand, whether it was autobiographical or how explicitly it stated sexual

subjects was of little relevance, but was extremely prejudicial. The trial court-set guidelines were consistent with this analysis and one of defendants' counsel went beyond the guidelines.

■ We will only reverse the order of the trial court granting a new trial if it is clear that no error justifying a new trial was committed; any doubts are resolved in favor of the ruling. We stated the rule in *Hays v. Herman,* 213 Or 140, 144, 322 P2d 119, 69 ALR2d 947 (1958): "It is, of course, well settled that the trial court has considerable latitude in granting a new trial, and all intendments are in favor of such an order."

Defendants also assert that the trial court could not grant a new trial upon the ground that counsel had made an improper argument because plaintiff did not object or move for a mistrial at the time. This argument was answered in *Hays v. Herman,* supra (213 Or at 147):

> "If the new trial had been denied, plaintiff's failure to object or move for a mistrial at the time of the emotional display would no doubt have prevented our reversing the judgment on that ground. But the failure to object is of lesser significance when a new trial has been granted. The trial court found as a fact that defendant's conduct deprived plaintiff of a fair trial, and he was not powerless to correct the situation. * * *."

Affirmed.