Argued and submitted May 16, 2001, reversed and remanded March 13, 2002

Brenda KAELON,
*Appellant,*

*v.*

USF REDDAWAY, INC.,
*Defendant,*

*and*

Jeffrey SKOCZLAS,
*Respondent.*

9906-06723; A111160

42 P3d 344

Kevin Keaney argued the cause and filed the briefs for appellant.

Karen Saul argued the cause for respondent. With her on the brief was Farleigh, Wada & Witt, P.C.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

**LINDER, J.**

Plaintiff brought this action against defendant Jeffrey Skoczlas, seeking damages for intentional interference with economic relations. Both plaintiff and defendant worked for USF Reddaway (Reddaway). Plaintiff worked as a support person in the accounts receivable department (AR), and defendant worked as a Vice President and Chief Financial Officer. Defendant moved for summary judgment, arguing that plaintiff failed to produce evidence from which a reasonable juror could find that he was a third party to plaintiff's economic relations with Reddaway. The trial court granted defendant's summary judgment motion. We reverse and remand.

We state the facts in the light most favorable to plaintiff, the nonmoving party. ORCP 47 C. Plaintiff began working as a support person for collectors in Reddaway's AR department in November 1996. She consistently performed well for Reddaway; indeed, her supervisors considered her work "outstanding." Defendant was the Vice President for Administration when plaintiff was hired and later became Reddaway's Chief Financial Officer. At all times his responsibilities included oversight of the AR department. Defendant supervised between 60 and 70 employees in several departments, but only six to eight of those employees reported directly to him. The remainder reported to intermediate managers. For example, plaintiff's immediate supervisor was Staci White, who reported to Laurel Bobzien, who, in turn, reported to defendant.

Before plaintiff began working at Reddaway, a neighbor who worked there would often tell her of goings on at the office. The neighbor, who worked in AR, told plaintiff that defendant was "after Marlys Hiepler," meaning that defendant was seeking to initiate a romantic relationship with Hiepler. Hiepler also was an employee in AR, where she worked as a collector. At the time, both defendant and Hiepler were married to others.

Plaintiff, too, noticed the relationship between defendant and Hiepler after she began working at Reddaway. Among other things, plaintiff observed defendant

spending a lot of time at Hiepler's cubicle, which was next to hers. Defendant sent Hiepler flowers and cards. Defendant and Hiepler left together for lunch several times, and would often spend their lunch hour together at Hiepler's nearby apartment.

Hiepler repeatedly told plaintiff about her relationship with defendant. She would come to plaintiff's cubicle nearly every day and explain the latest developments in her relationship with defendant, going so far as to tell plaintiff when she and defendant began having sex. Plaintiff was offended that Hiepler was carrying on the relationship with defendant, as both were married at the time. Plaintiff was further offended that Hiepler so frequently told her about it. The highly visible nature of the affair between a male supervisor and a female subordinate in an all-female department, as well as Hiepler's frequent updates about the affair, affected plaintiff's self esteem and productivity at work.

Due to her relationship with defendant, Hiepler enjoyed privileges not available to other employees in AR. Hiepler went to and from work as she pleased, returned home when she wanted to change her clothes, did not sign in and out for lunch breaks that sometimes extended beyond one hour, received compensation for time she did not work, and received a bonus, approved by defendant, at a time when she was on a leave of absence, in violation of Reddaway policy.

In early 1997, plaintiff, having grown tired of hearing about Hiepler's affair with defendant, told Hiepler she did "not want to hear about it." Hiepler, however, persisted, asking plaintiff why she did not want to hear about her relationship with defendant. After a brief exchange, plaintiff stated her belief that Hiepler was exchanging sex for gifts and for workplace privileges and called Hiepler a "prostitute." After that, Hiepler stopped talking to plaintiff about her relationship with defendant and immediately reported that exchange to White and Bobzien and, later, to defendant.

Frustrated by the preferential treatment that appeared to flow from Hiepler's sexual relationship with defendant, plaintiff complained to Bobzien in mid-to-late 1997. According to plaintiff, Bobzien responded that she was

"not in charge of that one," implying that, although she was nominally Hiepler's supervisor, her authority was somehow circumscribed when it came to Hiepler.

In July 1997, there was an opening for a collector in the AR department. Plaintiff told Bobzien about her interest in being promoted to the collector position. Bobzien replied that she would think about it, but did not speak further with plaintiff regarding the position. Subsequently, Bobzien awarded the position to another support person with less seniority than plaintiff. When plaintiff asked Bobzien why she did not get the promotion, Bobzien stated that she was "told to promote Faye Shumaker, that [plaintiff] was not to have the position." Although Bobzien did not tell plaintiff who told her to promote Shumaker rather than plaintiff, plaintiff assumed that it was defendant because "Laurel has to report to [defendant] and have it okayed."

Meanwhile, tension began to grow between plaintiff and defendant over his relationship with Hiepler. At one point, defendant accused plaintiff of spreading rumors about his relationship with Hiepler and told plaintiff that if she "continue[d] with these rumors, it could affect [plaintiff's] job." In October 1997, Hiepler received three anonymous letters discussing her relationship with defendant. All three of the letters threatened to disclose the relationship to Hiepler's and defendant's respective spouses. The second letter was printed on Reddaway stationery and delivered in a Reddaway envelope. The contents of the first letter are representative of the lot:

"To: Marlys [Hiepler]

"I just have a question for you; how can you be married, and sleep with a married man? Jeff Skozylas has toddler twins. I know all about the two of you. I have seen you together many times. The both of you give honest couples a bad name.

"Just so you know, a copy of this letter, and photographs of the two of you together will be mailed to your husband, and Jeff's wife. I wonder how your divorce proceedings will turn out once your husband has this information. If I were you...and I'm not...I would tell your husband before he receives this information in the mail. I'm sure you don't

want him to see pictures of you and Jeff in each others arms. You might want to tell Jeff to tell his wife also. The pictures are real explicit.

"Sincerely,

"An Honest Wife"

Defendant suspected that plaintiff was the "Honest Wife" behind the letters, although he later stated that he had no such proof. Plaintiff consistently denied authoring the letters and identified a coworker who, in the context of discussing defendant's affair with Hiepler, referred to herself as "the honest wife." In an effort to obtain plaintiff's fingerprints to see if they matched any that might be found on the letters, defendant walked up to plaintiff's cubicle and handed her a coffee mug. Defendant then took the mug, put it into a manila envelope, and returned to his office. There followed a heated verbal exchange between plaintiff and defendant in defendant's office, where defendant declined to accuse plaintiff of any specific wrongdoing, stating simply that "[y]ou know what it's all about." Staci White, plaintiff's immediate supervisor, intervened and temporarily defused the situation. Defendant never showed the letters to plaintiff and never had the fingerprints analyzed.

Meanwhile, on November 15, 1997, a coworker informed plaintiff that she had overheard defendant, referring to plaintiff, tell White that "I finally got the bitch. I finally have her. She's gone." Two days later, plaintiff received a written warning from Bobzien, warning her to stop making personal long distance phone calls from Reddaway phones, a practice that violated company policy as set forth in Reddaway's employee handbook, and one that could lead to termination. Plaintiff did not deny making such phone calls but, because it was a common practice among AR employees, plaintiff told Bobzien she felt like she was being singled out. In response, Bobzien "apologized up and down for having to do this," and asked plaintiff "[w]hat am I supposed to do? I was told to give this to you."

Also in November 1997, plaintiff again expressed interest in an open collector position and was again passed over. Bobzien awarded it to a less senior support person and

told plaintiff that she was giving the position to another support person because plaintiff was about to go on maternity leave. Four months later, plaintiff left on maternity leave, returning in 1999. Due to what she characterized as a "hostile environment" and "being fingerprinted, being taunted by [defendant's] looks, his gestures, not being promoted," and considering herself in a "dead-end position," plaintiff voluntarily left Reddaway in May 1999. She filed this action the next month, in June 1999.

Plaintiff's second amended complaint alleged the following: While plaintiff worked at Reddaway, defendant "openly carried on a romantic affair with another female employee and gave preferential employment treatment to this employee." Defendant wrongly believed that plaintiff was spreading rumors about his affair with Hiepler, and "engaged in actions intended to belittle and humiliate plaintiff and to cause her to leave employment." During that period, plaintiff applied for promotional opportunities for which she was qualified, but defendant refused to promote her "because he believed plaintiff was spreading rumors about his romantic affair." Defendant's actions "were not intended to serve the interests of [Reddaway], but were intended solely to serve defendant Skoczylas' personal interests."

Defendant moved for summary judgment, arguing that he played no role in the promotion decisions and, alternatively, that "plaintiff cannot prove that a third party interfered in plaintiff's business or contractual relationship with Reddaway because Skozcylas is not a third party to that relationship." Without elaboration, the trial court granted the motion and entered judgment in favor of defendant. On appeal, plaintiff renews her argument that there is "abundant evidence in this record from which the trier of fact could reasonably infer that [defendant] acted solely to further his own interests and improper motive—spite, revenge, retaliation, or similar motivation—when he denied promotions to plaintiff."

■  The tort of intentional interference with economic relations requires proof of six elements. The plaintiff must

prove: (1) the existence of a professional or business relationship, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages. *McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995).

Regarding the third element, whether a supervisor or other employee is a third party to a plaintiff's contract with the same employer depends on whether that employee was acting within the scope of his or her employment. That question, in turn, is analyzed by reference to the *respondeat superior* doctrine. *Id*. at 538. There, the test is whether: (1) the act occurred substantially within the time and space limits authorized by the employment; (2) the employee was motivated, at least partially, by a purpose to serve the employer; and (3) the act is of a kind that the employee was hired to perform. *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988).

We have previously explained how that rule applies in the specific context of an interference claim when the plaintiff alleges that her corporate employer's agent interfered with her contractual relations with her employer:

> "A corporate agent who induces a corporation to breach a contract with another party cannot be liable for intentional interference with that contract if the agent acted in the scope of the agent's employment. In that situation, the agent *is* the corporation. While a party to a contract may breach it, it is logically impossible for a party to interfere tortiously with its own contract. However, if the agent's sole purpose is one that is not for the benefit of the corporation, the agent is not acting within the scope of employment and may be liable."

*Boers v. Payline Systems, Inc.*, 141 Or App 238, 242-43, 918 P2d 432 (1996) (emphasis in original).

In this case, the act through which defendant allegedly intentionally interfered with plaintiff's contractual relations with Reddaway was his alleged refusal to promote plaintiff. There is no dispute that the act occurred within the time and space limits authorized by employment, or that the

act is of a kind that defendant was hired to perform. The focus, then, narrows to whether defendant was motivated, at least in part, by a purpose to serve Reddaway. Because this case comes to us on appeal from a summary judgment in favor of defendant, our task is to determine whether the record, viewed in the light most favorable to plaintiff, would permit an objectively reasonable juror to find or infer that defendant, in engaging in the conduct alleged, was solely motivated by a purpose to serve himself. ORCP 47 C; *Sims v. Software Solutions Unlimited, Inc.*, 148 Or App 358, 364-65, 939 P2d 654, *rev den* 326 Or 57 (1997). In doing so, we view the entire record in the light most favorable to plaintiff, the nonmoving party.

Considered in that light, the record shows that defendant carried on a romantic relationship with Hiepler and, as a result of that relationship, accorded her preferential treatment at work. Hiepler regularly told plaintiff about the relationship. Plaintiff told Bobzien, her immediate supervisor, that she objected to the relationship and to the preferential treatment. When defendant learned that plaintiff was complaining about his relationship with Hiepler, he engaged in conduct designed to cause her to leave employment at Reddaway. One of plaintiff's coworkers overheard defendant mention plaintiff's name and tell White "I finally got the bitch. I finally have her. She's gone." Two days later, Bobzien reprimanded plaintiff for making personal long distance telephone calls and threatened her with termination. Additionally, defendant attempted to connect plaintiff with the "Honest Wife" letters by not-so-surreptitiously taking her fingerprints. Plaintiff denied writing the letters, and defendant was never able to prove that she did. In the midst of all of that, plaintiff applied for promotional opportunities within the AR department. Defendant told Bobzien that plaintiff was "not to have the position."

From those facts, a reasonable juror could find that defendant, in humiliating plaintiff in the workplace, in denying her promotions, and in causing her to leave her employment, was retaliating against plaintiff for complaining about his romantic relationship with Hiepler. Under several of our prior cases, such a finding by the jury would support the further finding that defendant acted solely for his own benefit,

and not at all for the benefit of Reddaway. Indeed, *Huston v. Trans-Mark Services*, 45 Or App 801, 609 P2d 848, *rev den* 289 Or 587 (1980), is particularly close to this case on its facts. There, the defendant was regional vice president of a railroad company, the plaintiff was the company's sales manager, and both worked in the railroad's Portland office. After the defendant was transferred to New York, a woman with whom he was having an extra-marital affair and who worked for a customer of the railroad, wrote a letter to the railroad company's president, ostensibly from her employer, criticizing the Portland office staff. She did so in an alleged attempt to block the defendant's permanent transfer to New York. In the process of investigating the letter, the railroad's vice president learned of the defendant's extra-marital affair and indicated that he intended to fire the defendant. *Id.* at 807.

The plaintiff subsequently asked the defendant to write a letter explaining the woman's actual purpose in writing her letter and thereby clear the Portland office of any alleged wrongdoing. *Id.* The defendant agreed to do so, but threatened the plaintiff: "If you continue to pursue the matter, I'll get you. I have the connections in Kansas City" at the railroad's head office. *Id.* at 807-08. Their relationship continued to deteriorate, with the defendant regularly criticizing the plaintiff's work, whereas before the letter incident, he had praised the plaintiff's efforts as "excellent." *Id.* at 807. The defendant later successfully recommended that the plaintiff be terminated. *Id.* at 808. We concluded that the plaintiff had produced evidence from which a jury could find all of the elements of a claim for intentional interference, including that the defendant acted for an improper purpose.[1] *Id.* at 809.

Two additional prior cases decided by this court likewise support our conclusion in this case. In *Boers*, the plaintiff alleged in his complaint that Pease, the defendant, fired

---

[1] Although improper purpose and third-party status are discrete elements, *see Sims*, 148 Or App at 363, evidence that shows one may be sufficient to show the other, *see Boers*, 141 Or App at 245 ("evidence that the defendant did not act to serve the principal—which is sufficient to show that the defendant did not act in the scope of employment—may also be sufficient to show that the defendant had an improper purpose and thus may be liable for intentional interference.").

him " 'for the improper purpose to retaliate against [the] plaintiff' " for reporting Barcellona's prior misconduct. 141 Or App at 243. The plaintiff was Payline's vice president, chief financial officer, and corporate secretary; Pease was Payline's president. *Id.* at 240. Pease had hired Barcellona with knowledge that Barcellona had previously misappropriated money from Payline, but without disclosing that fact to Payline's board of directors. In response to a complaint about Pease and Barcellona, the plaintiff prepared a memorandum in which he discussed Barcellona's earlier misapplication of money. *Id.* Pease fired the plaintiff soon after the plaintiff circulated the memorandum. *Id.* at 241-42. In his complaint, the plaintiff alleged that Pease fired him in retaliation for disclosing to the board Barcellona's prior misconduct. *Id.* at 243. We concluded that the plaintiff's allegations were "broad enough to admit evidence that Pease acted for personal purposes [*i.e.*, in retaliation for revealing his own misjudgment in hiring Barcellona] and had no motivation to serve Payline," and that the plaintiff's complaint was thus sufficient to survive an ORCP 21 motion to dismiss. *Id.* at 243-44.

Finally, in *Schram v. Albertson's, Inc.*, 146 Or App 415, 429, 934 P2d 483 (1997), *rev dismissed* 328 Or 366 (1999), the plaintiff, the first female dispatcher for Albertson's, Inc., reported Harum, one of her immediate supervisors, for sexual harassment. The plaintiff initially and repeatedly reported Harum's misconduct to Sturgill and Cooper. Sturgill and Cooper, both of whom were friends with Harum, ignored the plaintiff's complaints. Frustrated with that lack of response and Sturgill and Cooper's indifference, the plaintiff eventually reported Harum's conduct to the transportation center's general manager. Harum was subsequently terminated. After that termination and allegedly in response to it, Sturgill and Cooper took retaliatory action against the plaintiff in an attempt to cause her to leave her employment. After Harum's termination, Cooper "ranted, raved, screamed, yelled, and swore at" the plaintiff, Sturgill required the plaintiff, but no other dispatcher, to arrive at work 15 minutes early, and both " 'became much more hostile toward [the] plaintiff.' " *Id.* at 418-19. We concluded that, "[u]nder those circumstances, a jury could find that [the

defendants] were acting solely for their own benefit and not to serve" their employer, and, therefore, that summary judgment for the defendants was improper. *Id.* at 429.

The common thread running through *Huston, Boers,* and *Schram* is that all involved incidents in which a supervisor, either allegedly or based on disputed evidence, retaliated for personal reasons against an employee for that employee's complaints about the defendant's wrongful conduct or that of another in the workplace. Here, plaintiff's complaints to Bobzien and her falling out with Hiepler concerned what she considered to be an improper sexual relationship between defendant and a female subordinate in an all-female office. The complaints to Bobzien also concerned plaintiff's perception that Hiepler was accorded preferential treatment as a result of her sexual relationship with defendant. Plaintiff's theory was that defendant refused to promote her as a way of retaliating against her for complaining about his affair with Hiepler. As outlined above, the record contains evidence to support that theory, and thus would permit a reasonable juror to find that defendant acted solely to serve his own interests, rather than to serve the interests of his employer.

In arguing to the contrary, defendant relies exclusively on our decision in *Sims,* urging that it stands for the proposition that, "in order to defeat [defendant's] motion for summary judgment, plaintiff must establish that he was *solely* motivated to serve himself and the actions of which she complains were not taken to serve Reddaway in any manner whatsoever." (Emphasis in original.) As an initial matter, defendant overstates plaintiff's burden, which, at the summary judgment stage, is one of production, rather than persuasion: That is, contrary to defendant's position, plaintiff need not *establish* that defendant was solely motivated to serve himself; rather, plaintiff need only produce evidence from which a reasonable juror could so find.

More fundamentally, defendant goes on to characterize *Sims* as holding something that it does not. According to defendant, we affirmed summary judgment for the defendant in *Sims* because "evidence that the supervisor had a

'personal vendetta' against [the] plaintiff was of 'no legal consequence' [because] there was evidence that the actions taken by the supervisor were done, at least in part, to serve the employer." That reading suggests that, to prevail at summary judgment, a defendant in an intentional interference action need only produce evidence from which a jury could find that he acted, at least in part, to serve the interests of his employer. Such a showing, according to defendant, is sufficient to defeat any contrary showing by a plaintiff that defendant acted for purely personal reasons. In other words, defendant's view is that *Sims* requires us, in effect, to reconcile or weigh the evidence in the summary judgment record, rather than view the evidence in the light most favorable to plaintiff.

*Sims* does not stand for that remarkable proposition, as a closer examination of its holding reveals. The plaintiff in *Sims* asked Software Solutions, Inc. (Software), to file documents with the Internal Revenue Service (IRS) that would allow her to take advantage of the Earned Income Credit at the end of each pay period, rather than wait until the end of the year to collect the credit. 148 Or App at 360. When Software failed to file the necessary documents, the plaintiff complained to the IRS. Additionally, the plaintiff was a signatory to a letter circulating at Software that alleged racial discrimination. The plaintiff, an at-will employee, was eventually terminated, after which she brought an action against her supervisor, Rodenbeck, for intentional interference with economic relations. *Id.*

The defendant moved for summary judgment, arguing that he was not a third party to the plaintiff's contractual relations with Software. In support of his motion, he introduced an affidavit in which he stated that, at all times, he was acting in the scope of his employment at Software. *Id.* at 361. The plaintiff responded with an affidavit from Banducci, a coworker. According to the affidavit, the defendant told Banducci that he "did not like" the plaintiff and that he " 'felt that she did not conduct her life very well.' " *Id.* at 362. Additionally, the plaintiff relied on the fact that the defendant told Banducci that:

> " 'I have given [plaintiff] every break. The problem is that I made a mistake. I try to be a nice guy and give jobs to people

that aren't qualified. I give them a position because they are friends with someone who works here. What I get in return is a troublemaker [who] calls the IRS and files a complaint, and what I need to do is get rid of the troublemakers.' "

*Id.*

We rejected the plaintiff's argument that the Banducci affidavit supported her assertion that the defendant was not acting in the scope of his employment, concluding that, "[a]ccording to plaintiff's evidence, [the defendant] fired her because he considered her a troublemaker *regarding Software's business practices.*" *Id.* at 364 (emphasis added). In other words, in response to the defendant's affidavit, the plaintiff in *Sims* offered evidence that served to establish that the defendant had a reason for terminating her that was in response to the plaintiff's conduct regarding Software's *business practices*. As we observed in our opinion,

"Unlike the defendants in *Boers* and *Schram*, who acted in pursuit of their individual interests and apart from or contrary to the interests of their employers, *plaintiff's own evidence* is that Rodenbeck acted in the interests of his corporate employer to rid it of an employee whom he perceived to have caused dissension."

*Id.* (emphasis added). In other words, even by the plaintiff's own evidence, whatever "personal vendetta" the defendant had related not to an individual interest or personal stake in the plaintiff's conduct, but to his interests as a supervisor. We therefore characterized the plaintiff's own evidence as being, at most, evidence of a mixed motive that failed to provide a basis for a trier of fact to infer that Rodenbeck acted "solely in pursuit of an interest *unrelated* to Software's business." *Id.* at 365 n 3 (emphasis added).

Thus, defendant's characterization of *Sims* is wrong. We did not hold that a plaintiff's evidence of personal motive for interference with an employment contract becomes legally inconsequential whenever the record contains other evidence that the defendant's actions were done at least in part to serve the employer. Rather, *Sims* turned squarely and only on the fact that the plaintiff's own evidence established such a mixed motive. This is not such a case. As already described, plaintiff's evidence here provided a basis for a trier

of fact to conclude that defendant had a purely personal interest and stake in plaintiff's conduct—*i.e.*, her conduct in complaining about the affair and his preferential treatment of Hiepler—and that defendant acted out of the purely personal motivation of retaliating against plaintiff for exposing his behavior. Under *Huston*, *Boers*, and *Schram*, plaintiff's evidence created a question of fact as to defendant's motivation, one that precludes summary judgment.

■  As an alternative basis for affirming the grant of summary judgment, defendant renews his argument that plaintiff did not present any evidence from which a jury could find that he participated in any of the promotion decisions; therefore, plaintiff cannot establish the element of causation. Specifically, defendant points to Bobzien's deposition testimony that defendant did not participate in the decision regarding the first promotion and argues that plaintiff produced nothing to refute that evidence. To the contrary, according to plaintiff's evidence, when plaintiff asked Bobzien why she was not promoted, Bobzien replied that she was "told to promote Faye Shumaker, that [plaintiff] was not to have the position." Plaintiff further testified that she believed that defendant told Bobzien that she "was not to have the position," because "Laurel has to report to [defendant] and have it okayed." Moreover, plaintiff presented other evidence, such as the reprimand for the long distance phone calls and the circumvention of Bobzien's authority to supervise Hiepler, from which a jury could find that defendant persistently intervened behind the scenes to control decisions that were attributed to Bobzien and others. That evidence was ample to create a triable issue of fact on the element of causation. Defendant was not entitled to summary judgment on that ground.

Reversed and remanded.