Argued and submitted November 21, 2011, affirmed May 16, 2012

**MANNEX CORPORATION,**
an Oregon corporation,
*Plaintiff-Appellant,*

*v.*

Rebecca **BRUNS,**
*Defendant-Respondent.*

Multnomah County Circuit Court
090201607; A145767

279 P3d 278

Kenneth P. Dobson argued the cause for appellant. With him on the briefs was Chenoweth Law Group, PC.

Robyn Ridler Aoyagi argued the cause for respondent. With her on the brief was Tonkon Torp LLP.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Plaintiff brought this action for intentional interference with economic relations (IIER) and defamation.[1] The trial court granted defendant's motion for summary judgment on the ground that, with respect to each claim, plaintiff had not provided sufficient evidence to create a jury question as to an essential element: with respect to IIER, that defendant was a "third party" who interfered with one of plaintiff's economic relationships; and with respect to defamation, that defendant's defamatory statements were the legal cause of injury to plaintiff. Plaintiff appeals from the subsequently entered judgment. We agree with the trial court that plaintiff did not produce any evidence that defendant was a "third party," as opposed to a participant, in the allegedly interfered-with economic relationship. We also conclude that, although the evidence created a disputed issue of fact with respect to whether defendant's defamatory statements caused injury to plaintiff, her statements were qualifiedly privileged. Therefore, we affirm, albeit we affirm the defamation claim based on reasoning that differs from the trial court's.

We will affirm the trial court's ruling granting a defendant's motion for summary judgment if there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law. ORCP 47 C. No genuine issue as to a material fact exists if, based on the record before the court viewed in the light most favorable to the plaintiff, no objectively reasonable juror could return a verdict for the plaintiff on the matter that is the subject of the motion for summary judgment. *Id.*; *Morehouse v. Haynes*, 350 Or 318, 320, 253 P3d 1068 (2011). The plaintiff has the burden of producing evidence on any issue raised in the motion as to which the plaintiff would have the burden of persuasion at trial. ORCP 47 C.

---

[1] Plaintiff's complaint alleged a claim for "wrongful interference with business relations" and plaintiff's appellate brief characterizes the claim as "tortious interference with business relations." However, the majority of Oregon cases refer to the claim as "intentional interference with economic relations"; therefore, we use that terminology.

Viewed in the light most favorable to plaintiff, the relevant facts are as follows. Between 1999 and 2008, plaintiff provided custom metal fabrication and other services to PCC Structurals, Inc. (PCC), a division of Precision Castparts Corp. and a manufacturer of metal components and parts for industrial and aerospace customers. Defendant was a purchasing manager at PCC. She was responsible for managing vendors, including plaintiff, and ensuring that they followed company policies for bidding and purchasing. In 2002, despite PCC's general satisfaction with plaintiff's work, defendant compiled a report of her concerns that plaintiff was overbilling PCC by overstating hours worked and labor rates; had improper access to PCC that other vendors did not enjoy; was taking PCC supplies and parts without PCC's permission; and was outsourcing jobs to other vendors. After reviewing this report, PCC purchasing director Webb instituted a policy that plaintiff was not allowed to do work at any PCC facility other than the Small Structures Business Office (SSBO). Defendant testified without contradiction that she "provided [Webb] with the facts," but "[h]e made the decision" to restrict plaintiff to working at SSBO only. Plaintiff did not know of defendant's 2002 report until discovery in this lawsuit nor did it know about the policy banning it from non-SSBO facilities until it stopped working for PCC in 2008.

In 2005, defendant informed new employee Potter, as part of his training as a buyer, that plaintiff was a "crook[ ]," that he should "never want to do business with [plaintiff]," and that he should "remember that name." She also told Potter and Webb that she had heard rumors of plaintiff providing gratuities to PCC employees in exchange for favorable treatment. Defendant transferred Potter to SSBO to try to find "dirt" on plaintiff. According to Potter, defendant also laughed aloud when she showed him a spreadsheet illustrating PCC's declining payments to plaintiff.

In 2008, Potter was suspended from PCC for allowing plaintiff to work at PCC's Deer Creek facility contrary to the "SSBO only" policy. Defendant, then a supply chain manager, and a colleague, Addonisio, investigated Potter's communications with plaintiff and determined that they had

been working together to circumvent the SSBO-only restriction and that Potter had given PCC's confidential source list to plaintiff, also in violation of PCC policy. The report from defendant and Addonisio was one of the reasons Collinson, the purchasing director, completely terminated plaintiff as a vendor in late 2008.

Plaintiff subsequently filed this lawsuit, alleging claims for defamation and intentional interference with economic relations. Defendant moved for summary judgment, arguing that plaintiff's claims were barred by the statute of limitations, that her statements were not published or communicated to third parties, that her statements were privileged, and that her statements did not cause plaintiff harm. The trial court granted defendant's motion for summary judgment, concluding that, with respect to the defamation claim, although there were genuine issues of material fact as to the statute of limitations, publishing to third parties, and privilege defenses, there was no evidence from which a reasonable factfinder could find that defendant's defamatory statements caused harm to plaintiff. Regarding the IIER claim, the court concluded that no reasonable factfinder could find that defendant's statements were communicated to a third person, because defendant and one of the parties to the economic relationship—defendant's employer—were the same "person." The trial court entered a general judgment of dismissal in favor of defendant, from which plaintiff now appeals. ORS 19.205.

We first address plaintiff's argument that the trial court erred in granting summary judgment on the IIER claim. To prevail, plaintiff must prove six elements: (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a *third party*, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages. *McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995). The tort of IIER "serves as a means of *protecting* contracting parties against interference in their contracts from *outside* parties." *Id.* at 536 (emphasis in original).

Plaintiff asserts that, contrary to the trial court's conclusion, there were genuine questions of fact as to whether defendant was a third party to the relationship between plaintiff and PCC.[2] For the following reasons, we disagree.

Whether an employee is a third party to her employer's contract with another person or entity depends on whether that employee, in performing the alleged interference, was acting within the scope of her employment. *Kaelon v. USF Reddaway, Inc.*, 180 Or App 89, 96, 42 P3d 344 (2002). That question, in turn, is analyzed by reference to the *respondeat superior* doctrine. *McGanty*, 321 Or at 538. The test is whether: (1) the act occurred substantially within the time and space limits authorized by the employment; (2) the employee was motivated, *at least partially*, by a purpose to serve the employer; and (3) the act is of a kind that the employee was hired to perform. *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988). We have explained how that rule applies in the specific context of an IIER claim where a plaintiff alleges that another party's agent interfered with the plaintiff's contractual relations with the agent's employer:

> "A corporate agent who induces a corporation to breach a contract with another party cannot be liable for intentional interference with that contract if the agent acted in the scope of the agent's employment. In that situation, the agent *is* the corporation. While a party to a contract may breach it, it is logically impossible for a party to interfere tortiously with its own contract. However, if the agent's sole purpose is one that is not for the benefit of the corporation, the agent is not acting within the scope of employment and may be liable."

*Boers v. Payline Systems, Inc.*, 141 Or App 238, 242-43, 918 P2d 432 (1996) (emphasis in original). Thus, so long as the actor's conduct is within the scope of his or her authority and

---

[2] We note that the substance of plaintiff's second assignment of error is whether, for purposes of an IIER claim, defendant *is* a third party, not, as plaintiff and the trial court mislabeled it, whether defendant "communicated defamatory statements to a 'third person.'" That mislabeling confuses the elements of a defamation claim with the elements of an intentional interference with economic relations claim.

is undertaken at least in part to further the best interests of the employer, it is immaterial that the actor has additional motives—even improper ones. *Sims v. Software Solutions Unlimited, Inc.*, 148 Or App 358, 364-65, 939 P2d 654, *rev den*, 326 Or 57 (1997). In contrast, when the actor acts against the best interests of the employer or *solely* for her own benefit, she could be held liable in tort for the harm done to the other contracting party. *Id.* at 365.

The trial court found that defendant was not a third party to the relationship between plaintiff and PCC, and we agree. *Sims* is instructive. In that case, we analyzed whether one of the defendants, the president of the plaintiff's former employer, was a third party, acting outside the scope of his employment, for purposes of an IIER claim. *Id.* at 360, 364. Prior to being discharged, the plaintiff, an at-will employee, had complained to the Internal Revenue Service that her employer had not implemented the computation of a tax credit in her paycheck, and she had signed a memo from several employees to the employer complaining about a supervisor's use of racial slurs. *Id.* There was evidence that the defendant stated that he "did not like" the plaintiff, that he "felt that she did not conduct her life very well and had too many personal problems," and that he considered the controversy about the tax credit to have caused dissent among the employees. *Id.* at 362. The defendant also allegedly stated that the plaintiff was "a troublemaker [who] calls the IRS and files a complaint, and what I need to do is get rid of the troublemakers." *Id.*

We affirmed the trial court's grant of summary judgment in favor of the defendant because the defendant, acting within the scope of his employment, had the authority to fire the plaintiff without cause on behalf of the employer and, according to the plaintiff's own evidence, the defendant's actions were done, at least in part, to benefit the employer by terminating an employee who was deemed a troublemaker. *Id.* at 362, 364-65. The record contained no evidence that the defendant acted *solely* for his own interests. *Id.* at 365. Therefore, the defendant could not be a "third party" to the employment relationship between the plaintiff and the employer as a matter of law. *Id.*

Here, although plaintiff does not clearly specify which of defendant's actions intentionally interfered with plaintiff's business relationship with PCC, we infer that the relevant acts were defendant's 2002 report compiling her concerns about plaintiff's billing practices and its access to PCC facilities and supplies; defendant's statements to another employee (Potter) about plaintiff being a "crook[ ]"; defendant asking Potter to try to find "dirt" on plaintiff; defendant's report to Webb and Potter of rumors about plaintiff providing kickbacks to PCC employees; and defendant's 2008 report to her supervisor about Potter's efforts to circumvent the SSBO-only policy. Though plaintiff questions defendant's motivation, there is no dispute that defendant's actions occurred within the time and space limits authorized by her employment and that her actions were of a kind that she was hired to perform.

Our focus, then, narrows to whether defendant was motivated, at least in part, by a purpose to serve her employer, PCC. Because this case comes to us on appeal from summary judgment in favor of defendant, our task is to determine whether the record, viewed in the light most favorable to plaintiff, would permit an objectively reasonable juror to find or infer that defendant, in engaging in the conduct alleged, was solely motivated by a purpose to serve herself. ORCP 47 C; *Sims*, 148 Or App at 364-65.

Plaintiff relies on allegations that defendant "harbored a deep personal grudge and vendetta against [plaintiff], dating back over ten years arising from an unrelated business dispute between * * * defendant's mother and Mr. Keller's [plaintiff's president] mother." However, there is no specific evidence in the summary judgment record of this alleged grudge and vendetta. Keller submitted a declaration stating that he had been told that defendant disliked plaintiff during the time it provided services to PCC, but he did not know why. He stated,

"I have been asked by various PCC employees what I did to make [defendant] dislike me and my company. I was even asked by one manager whether I had been in a romantic relationship with [defendant] because according to the manager, only a woman scorned in love could have so much resentment towards a man. However, I have never been in

a romantic relationship with [defendant] and I do not know why she dislikes me so much. After hearing rumors from various PCC employees, my *best guess* is that [defendant's] mother and my mother * * * used to work with each other and that [defendant] perceives some grudge or feud between the two that motivated her to attempt to make it difficult for [plaintiff] to work at PCC. In addition, [a former PCC buying agent] took away the master purchase order from Tri-Lett Industries and issued the same numbered purchase order to [plaintiff]. We think that with [the buying agent] having terminated [defendant's] parents' company as a vendor, along with switching the purchase order from Tri-Lett to [plaintiff] and being personal friends with [Keller's mother] is what caused [defendant] hard feelings."

(Emphasis added.) The record contains several similar instances of speculation and rumors overheard by PCC employees and plaintiff's two owners. A declaration by former PCC employee Potter states that defendant laughed while showing him a spreadsheet illustrating the decline in PCC's payments to plaintiff. The only other evidence is deposition testimony of Keller that he had asked his mother about her relationship with defendant's mother, and she stated that they were presently friends but that "years ago * * * there may have been a problem." No further details are contained in the record. Thus, aside from what plaintiff admits was speculation, plaintiff did not present any evidence to create a genuine issue of fact about defendant's personal interest in the business relationship between plaintiff and PCC. We "recognize that the line between permissible inferences from facts and impermissible speculation is a fine line indeed." *State v. Baty*, 243 Or App 77, 86, 259 P3d 98 (2011). In the present case, however, the inference of some ulterior motive beyond a desire to help her employer, based on rumors (denied by both parties) of a failed romance and a "best guess" regarding an old family feud, clearly falls on the speculative side of the line. We conclude that the trial court correctly granted summary judgment to defendant on plaintiff's IIER claim.

We turn, then, to plaintiff's argument that the court erred in granting summary judgment against its defamation claim. To prevail, plaintiff must establish that the evidence in the summary judgment record would allow a reasonable

factfinder to find: (1) the making of a defamatory statement; (2) the "publication" of the defamatory material; and (3) a resulting special harm, unless the defamatory statement gives rise to presumptive special harm. *Wallulis v. Dymowski*, 323 Or 337, 342-43, 918 P2d 755 (1996); *Hinkle v. Alexander*, 244 Or 267, 273, 417 P2d 586 (1966); *L & D of Oregon, Inc. v. American States Ins. Co.*, 171 Or App 17, 22, 14 P3d 617 (2000). Here, the trial court concluded that there was no evidence from which a factfinder could find that defendant's conduct was the legal cause of any damages allegedly incurred by plaintiff because Collinson, not defendant, decided to terminate plaintiff as a vendor, he did not ask for defendant's advice, and defendant did not participate in the decision.

However, whether defendant participated in the 2008 decision to terminate plaintiff as a vendor does not answer the question whether defendant's alleged defamatory statements resulted in special harm to plaintiff. The trial court's opinion did not consider whether defendant's earlier pre-2008 statements influenced PCC's termination of plaintiff as a vendor or whether plaintiff was harmed as a result of those earlier statements by losing business at PCC facilities other than SSBO. Although there is evidence in the record that plaintiff's violation of the SSBO-only policy was the reason Collinson terminated plaintiff as a vendor, there is also conflicting evidence that PCC's general counsel and Collinson stated in 2009 that plaintiff was terminated due in part to concerns about overbilling and kickbacks to PCC employees, the same concerns that were ignited by defendant's 2002 report and 2005 statements. Additionally, there are also facts in the record to support plaintiff's theory that defendant's 2002 statements caused PCC to institute the SSBO-only policy and, but for the creation of that policy, plaintiff would not have been terminated as a vendor when it attempted to work at a facility other than SSBO. Based on this conflicting evidence, a reasonable juror could find that defendant's statements were the cause of damages to plaintiff.

Our analysis, however, does not end here. Defendant also raises two alternative bases to affirm the trial court's grant of summary judgment on the defamation claim—that

defendant's statements were privileged and that the claim is time barred by the statute of limitations. Plaintiff contends that we cannot consider defendant's alternative reasons for affirming summary judgment because they were expressly rejected by the trial court; therefore, plaintiff argues, defendant had to challenge the trial court's rejection of those arguments by filing a cross-assignment of error. ORAP 5.57. We disagree. "The requirement of cross-assignment in ORAP 5.57 applies to *rulings* and is not implicated when the respondent embraces the ruling and seeks only to challenge the trial court's *reasoning*." *Oak Crest Const. Co. v. Austin Mutual Ins. Co.*, 329 Or 620, 626, 998 P2d 1254 (2000) (emphasis in original; footnote omitted); *accord Tualatin Valley Builders Supply v. TMT Homes*, 179 Or App 575, 582 n 2, 41 P3d 429 (2002) ("[A] cross-assignment of error is not required when, as here, the respondent embraces the trial court's ruling and seeks only to defend the ruling based on alternative *reasoning*." (Emphasis in original.)). Defendant's alternative arguments are directed at the rationale used by the trial court to grant summary judgment as to plaintiff's defamation claim; in other words, defendant embraces the trial court's ruling (that is, the grant of summary judgment) and seeks only to challenge the trial court's *reasoning*. Therefore, we may consider the alternative bases for affirmance. Because it is dispositive, we begin with defendant's argument that her defamatory statements were privileged as statements to other PCC employees to further their mutual concern: compliance with PCC's Purchasing Department policies.

A statement that is otherwise defamatory is privileged if it is uttered under such circumstances that the law grants immunity to the speaker. *Wattenburg v. United Medical Lab.*, 269 Or 377, 379, 525 P2d 113 (1974). A statement is qualifiedly privileged if: (1) it was made to protect the defendant's interests; (2) it was made to protect the interests of the plaintiff's employer; or (3) it was on a subject of mutual concern to the defendant and the persons to whom the statement was made. *Wallulis*, 323 Or at 350. Such statements are only qualifiedly privileged because the plaintiff may overcome the privilege by offering evidence of some kind of improper motive on the defendant's part. *Wattenburg*, 269 Or at 380. The privilege may also be lost if the speaker

does not believe that the statement is true or lacks reasonable grounds to believe that it is true. *Lund v. Arbonne International, Inc.*, 132 Or App 87, 96, 887 P2d 817 (1994).

Defendant's statements were qualifiedly privileged, either because they were made to protect the interest of defendant's employer or, alternatively, because they were made by defendant to her employer on a matter of mutual interest—the well-being of PCC, and, in particular, plaintiff's compliance with PCC's Purchasing Department policies. *Wallulis* is instructive. In that case, one of the defendants, an employee, made defamatory statements concerning the work-related conduct of the plaintiff, another employee of the same corporate employer, to their mutual supervisor. 323 Or at 340-41. We held that the qualified privilege applied:

> "A defamatory work-related statement made by an employee to that employee's supervisor concerning another employee's work performance falls into either the second or third category delineated by the court in *Wattenburg*. Such a statement could be made to protect the interests of the employer, or it could be on a subject—such as workplace harmony—of mutual concern to the defamer and the supervisor to whom the statement was made."

*Id.* at 350-51. We see no reason why the same reasoning should not apply when an employee makes a defamatory statement to an employer, not about a fellow employee, but about a vendor or supplier of labor.

The question then becomes whether plaintiff raised a fact question as to whether defendant abused her privilege. In *Wallulis*, the court concluded that there were genuine issues of material fact as to whether the defendant lost the qualified privilege by having an improper motive based on evidence that he was extremely angry with the plaintiff, became enraged, used obscenities, and made physical threats against the plaintiff. *Id.* at 351 n 7. Additionally, the defendant reported that the plaintiff had a substance abuse problem without verifying the accuracy of that statement, constituting reckless publication in abuse of the privilege. *Id.* Therefore, summary judgment on the plaintiff's defamation claim was reversed. *Id.* at 355.

Here, the trial court concluded that there was a genuine issue of material fact as to whether the privilege was lost through abuse, reasoning that a factfinder could conclude that defendant was motivated by a vendetta against plaintiff, not by an effort to protect or benefit her employer. However, as discussed above in the context of plaintiff's intentional interference claim, there was no evidence on the summary judgment record of this alleged grudge and vendetta other than universally denied rumors of a romantic relationship gone wrong and "best guesses" regarding an old family feud. The only evidence that nears an improper motive is Potter's statement that defendant laughed when showing him a spreadsheet of PCC's declining payments to plaintiff; that fact alone does not rise to an abuse of the privilege. Similarly, though plaintiff vigorously disputes the accuracy of defendant's 2002 report, there was no evidence from which it could be found that defendant had no reasonable belief in the truth of her statements. Thus, there was no evidence that defendant abused her qualified privilege, and the trial court did not err in granting summary judgment on the defamation claim.

Affirmed.